Carl GAMBELLO, Plaintiff,

v.

TIME WARNER COMMUNICATIONS, INC., a division of Time Warner, Inc., Time Warner, Inc, Steven McPhie, and Larissa Herda, Defendants.

No. 97–CV–7591 NG.

United States District Court, E.D. New York.

Feb. 15, 2002.

Robert M. McCaffery, Scotch Plains, NJ, Leonard N. Flamm, New York, for plaintiff.

Kenneth A. Margolis, New York, for defendant.

## OPINION AND ORDER

GERSHON, District Judge.

Plaintiff Carl Gambello brings this action against defendants Time Warner Telecom, Inc., successor in interest to Time Warner Communications, Inc. ("TWTC"), Stephen McPhie, and Larissa Herda,[1] alleging 1) discrimination on the basis of age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. §§ 621 *et seq.*, and the New York State Human Rights Law ("HRL"), New York State Executive Law §§ 290 *et seq.;* 2) breach of contract; and 3) misrepresentation. Defendants move for summary judgment pursuant to Fed. R.Civ.P. 56(b) to dismiss plaintiff's claims in their entirety, and for sanctions pursuant to Fed.R.Civ.P. 11.

### Facts

Unless otherwise indicated, the following facts are undisputed.

*1. Hiring:* Plaintiff worked for Manhattan Cable Television, the predecessor to Time Warner Cable, from 1980 until 1988,

---

**1.** Time Warner, Inc., which is also a named defendant, was voluntarily dismissed by order dated October 4, 2000.

eventually becoming Vice–President of Corporate Development. He voluntarily left Manhattan Cable when it de-emphasized its telecommunications business, and he began working as an independent consultant. From July 1993 until December 1993, plaintiff worked as an independent consultant for Time Warner AxS of New York City ("TWAxS"), which is owned by TWTC. As an independent consultant, plaintiff assessed the feasibility of TWAxS entering the telecommunications market in New York City and negotiated franchise agreements with the City which allowed TWAxS to sell telecommunications services in New York City. Following the granting of a franchise agreement in December, Barry Rosenblum, the President of Time Warner Cable of New York City,[2] and Eric Tveter, the General Manager of TWAxS meet with plaintiff twice in mid-January 1994 to discuss hiring plaintiff for the position of Director of Sales and Marketing for TWAxS. Gambello Aff. ¶¶ 2–5; Gambello Depo. 137–40.

At the meetings, plaintiff claims that Rosenblum and Tveter said that the position would start as a Director position, but that over time it could develop into a Vice–President position if business volume warranted. He testified as follows:

Q   What was said in the course of that meeting?

A   . . . . They talked about this position if there's was a significant amount of sales to be done to cable customers and others could start a director's spot, but then over time become a—become a VP spot and they asked me to consider all of the factors  . . . .

    \*    \*    \*    \*    \*    \*

Q   Did they discuss what it would take for this director's position to become over time a VP spot?

A   They talked about business volume warranting that kind of thing, because in their mind they visualized an extensive sales staff reporting into either a manager or a director and the director evolving, because of the span of control to a vice president spot.

Gambello Depo. 139–41, 145.

At the meeting, plaintiff also claims that he:

said that this is the company that I would like to retire from. I have no interest in going somewhere else, so when I said that, there seemed to be a general sense that this was something that was doable, as long as performance warranted that kind of thing. You never get guarantees, but you can recognize when people agree with what you are saying.

*Id.* 145–46. Plaintiff claims that, while neither Rosenblum nor Tveter said anything, Rosenblum nodded his head "in approval." *Id.* In response to a Request for Admission, plaintiff admits that his "employment was not of a specific duration." Margolis Exhibit I. Both Rosenblum and Tveter deny that they promised plaintiff either that he could work until he retired or that he would become a Vice–President. Rosenblum Depo. 41, 60–61; Tveter Aff. ¶ 7.

Finally, plaintiff claims that he:

A   . . . mentioned things that were important to me and that I would have to consider and one of them was bridging my services from the prior relationship with Manhattan Cable to the new relationship under Time Warner AxS and I did that because under the old rule, the ten year rule, I was not eligible for pension, even though I had

---

**2.** At this time, TWAxS reported to Time Warner Cable of New York City. At some point in the future, TWAxS reported directly to TWTC in Denver, Colorado. *See* Gambello Aff. ¶ 6.

been with Manhattan Cable eight years or so, so I wanted the service bridge if that was possible.

Q  Let me stop you for a second. Did you use the term bridging of service?

A Yes.

Q  In the meeting with them?

A Yes.

Q  Can you explain what you meant by bridging of service?

A Well, building on the eight years that I had so that I would become qualified just about immediately for pension.

Q  So you wanted your approximately eight years of prior employment with Manhattan Cable -

A Right.

Q  To count toward your pension benefits with Time Warner AxS?

A That's right.

\*    \*    \*    \*    \*    \*

Q  Is that entirely what you meant by bridging of service?

A Yes.

Gambello Depo. 141–42.  Rosenblum and Tveter told him that he could bridge his service from Manhattan Cable.  Plaintiff claims that he would not have gone to work for TWAxS had these "representations" not been made.  Gambello Aff. ¶ 8.

On January 17, 1994, plaintiff signed an employment application and began work. Plaintiff was 53 years old.  The employment application states that

I understand that nothing contained in this employment application or in the granting of any part of the employment process, is intended to create an employment contract between the companies and myself.  If I am employed, either the companies or I may terminate my employment at anytime and for any reason.

Gambello Depo. Exhibit 7. Plaintiff also received an Employee Handbook, which states that employment can be terminated with or without cause, and with or without notice, at the option of either the company or the employee.  The handbook also stated that "work rule violations are usually addressed by the following progressive disciplinary procedures:  1) First Step: Verbal Warning; 2) Second Step: Written Warning; 3) Third Step:  Suspension or Performance  Improvement  Plan;  4) Fourth Step: Termination.  However, the outlined disciplinary procedures are not intended to be all inclusive.  Circumstances surrounding the violations are a factor in determining appropriate discipline."  A non-exhaustive list of major work rules violations does not include failure to meet sales predictions.  Gambello Depo. 204, 206, Exhibits 9, 10.

*2.  Employment and Termination:*  At TWAxS, plaintiff reported to Tveter.  His responsibilities involved the sale and marketing of dedicated services, which provide a fixed bandwidth of telecommunications connectivity between two specified points. Plaintiff's duties also included ensuring compliance with franchises, providing communication services to customers, identifying buildings that represented significant sales opportunities, developing job descriptions for sales executives and engineers, and developing the business brochure.  In 1994 and 1995, TWAxS was engaged in the construction and preliminary marketing of a network to prepare for the installation of a switch which, unlike dedicated services, permits connectivity between any two points.  With the installation of a network and a switch, TWAxS would be able to compete with local telephone service providers such as NYNEX.  Gambello Depo. 221; Tveter Dec. ¶ 9–10.  Plaintiff admits that, since TWAxS was in the process of installing a network and switch, TWTC had low sales expectations in 1994 and

1995, but that sales expectations would increase once a network and switch had been installed. Gambello Depo. 231–32, 240.

In 1994 and 1995, plaintiff received annual evaluation scores of 3.68 and 3.7, respectively, on a scale of 4 from Tveter. A score of 3 is described as "Meets Requirements. Performance is consistently at an expected level of competency. Occasionally performs above expected levels." A score of 4 is described as "Exceeds Requirements. Performs above expected levels with consistently high quality results." On the 1995 evaluation, Tveter notes that the "network is nearly ready and now the real challenge begins." Gambello Aff. Exhibits A, B.

By late 1995 or early 1996, the switch had been installed, and Plaintiff began selling switch services on a flat rate basis. The switch never became fully operational during Plaintiff's tenure so TWAxS could not sell services on a usage basis. Plaintiff and Tveter set a sales/revenue growth budget for 1996 of $3,781,452. The actual 1996 revenue growth was $1,457,389. This shortfall, $2,324,063, was the greatest shortfall in the nation. New York's actual revenue was significantly lower than much smaller markets, including Charlotte, Raleigh, and Rochester, and San Antonio. San Antonio itself had revenue more than triple the revenue of New York. Gambello Depo. 222–24, 240–42; Tveter Dec. ¶ 13; Herda Dec. ¶¶ 12–13, Exhibit B.

That year Tveter's rating of Plaintiff fell to a 3.3, which still surpassed the "meets requirements" level. In the comments section, Tveter stated that Plaintiff:

Is dedicated, hardworking, and a team player and takes initiative (kudos for Best New Product Award at the CMA). Carl sometimes should handle conflict in a less "hard-nosed" way. "Constructive confrontation" might be a better approach.1997 is an important year and it is crucial that the revenue budget is achieve each month next year.

Gambello Aff. Exhibit C. In December 1996, plaintiff also received the largest percentage merit increase that he had received during his employment at TWAxS. Gambello Aff. ¶ 12.

In January 1997, Stephen McPhie was hired as the new President and CEO of TWTC, and in March 1997, Larissa Herda was hired as the Senior Vice–President of Sales and Marketing. McPhie and Herda were hired to turn the company around and boost sales, which were extremely low. According to McPhie and Herda, if the company could not be turned around within one year, the owners would sell TWTC's assets and close the company. Herda Depo. 15, 74, 120–21; McPhie Depo. 77–78. Thus, on March 7, 1997, Herda announced a company-wide revenue goal of $60,000,000 by the end of 1997.

It is undisputed that improving sales in the New York market was important to meeting this company-wide sales goal. During Herda's first week of employment, David Raner, Vice–President of Finance, informed her that one of his primary concerns was the "appallingly low" sales in New York City. After reviewing a sales summary sheet for 1996, Herda agreed that New York's low sales were a major problem for the company. McPhie and Herda were concerned that management in the New York office had more knowledge and experience in cable than in telephony, and that they were thus too tied to the cable side of the business. Plaintiff himself recognized that "there is a relationship that I bring to this party that is a cable as well as a communications relationship and I believe the folks who came in might not have appreciate that relationship with the cable side, because there seemed to be … a breaking away of that attitude." Gambello Depo. 90, 329; Tveter Decl. ¶ 17; Herda Dec. ¶¶ 5, 11–14.

In order to meet their company-wide sales goals, McPhie and Herda began restructuring the company in early 1997. They separated TWTC from the cable television operations of Time Warner Cable. As part of this separation, general managers of each TWTC city office reported to Herda instead of to executives at Time Warner Cable. Managers in each city were to provide the central office in Denver weekly sales reports, and the central office provided each city General Manager a a monthly "1997 Total Revenue to Budget" report, which tracked sales growth. These reports were discussed during weekly telephone conference calls. Plaintiff participated in these weekly calls beginning in April 1997 and received Total Revenue to Budget Reports for April, May, and June. Gambello Depo. 30, 267–70; Tveter Dec. ¶¶ 17, 20; Herda Depo. 31–33, 84–89, Exhibit 9; Herda Dec. ¶ 42. Further, the position of Director of Marketing at the city level and all marketing functions were centralized in the TWTC home office, and the resulting "position of director of sales was more revenue-driven than the position of director of marketing." Bob Meldrum became the Director of Marketing at TWTC's central office. Thus, many of plaintiff's marketing functions were taken over by the central office in order to have plaintiff focus more on revenue generation. Gambello Depo. 90, 93–94, 267; Herda Depo. 41–44, 49–50, 78.

Finally, McPhie and Herda made personnel changes including the promotion, transfer, and termination of senior personnel. Approximately 30 employees were terminated between January and August 1997. The only evidence as to the age of the terminated employees indicates that five of the thirty, including plaintiff, were over 40. Several executives also resigned. Among them was Tveter, who resigned in April 1997. Herda never asked Tveter to leave, but after a meeting, Tveter determined that he was not the right man for the position. Herda Depo. 77; Herda Dec. ¶ 8; Tveter Dec. ¶ 25; McPhie Depo. 28–30. Herda hired several former colleagues from Metropolitan Fiber Systems ("MFS"), whom she knew to be aggressive salesmen. Herda Depo. 42–43, 100; McPhie Depo. 29, 38–41, 44–45.

New York's 1997 sales goals, which Plaintiff had participated in preparing, called for growth of $24,619 per month recurring revenue.[3] Herda considered this revenue growth to be far too low for a market the size of New York, so when Herda revised the revenue budget for each city, she expected New York's monthly revenue growth to exceed $35,729 beginning in April 1997. A memorandum announcing the budget revisions was distributed March 28, 1997, and the revised budget was announced during the weekly conference calls the last two weeks in March. Gambello Depo. 224; Herda Dec. ¶¶ 18–19, 32–33, Exhibit H. The actual monthly recurring revenue growth for New York was as follows:

| Month | Growth (Decrease) | Budget Shortfall |
|---|---|---|
| January | $ 14,326 | $ 10,293 |
| February | $ 5,843 | $ 18,776 |
| March | $ 957 | $ 23,662 |
| April | ($112,824) [4] | $148,553 |
| May | ($ 83,676) [5] | $123,405 |
| **Total** | **($175,374)** | **$324,689** |

---

**3.** TWTC receives two types of revenue. Recurring revenue, which is the majority of the company's revenue, consists of monthly fees for telecommunications services. Non-recurring revenue consists of one-time payments, such as installation fees. Herda Dec. ¶ 15.

**4.** Approximately $26,000 of this lost revenue is attributable to the fact that revenues from residential service were reclassified from Time Warner Telecom to Time Warner Cable nationwide in April. Herda Dec. ¶ 35.

**5.** The May 1997 revenue report shows a growth of $552,535, but this seemed unusual-

Herda Dec. 22, 27, 34–35, 38–39, Exhibits D to J. Once again, New York had the worst revenue growth in the first five months of 1997, despite being the largest market in the nation, with revenue declining by $175,374. Revenue growth for each city in the first five months of 1997 was as follows:

| City | Growth (Decrease) |
| --- | --- |
| Austin | $ 81,111 |
| Charlotte | $ 95,453 |
| Cincinnati | $ 71,356 |
| Hawaii | $ 4,727 |
| Houston | $ 47,552 |
| Indianapolis | $ 86,075 |
| Manhattan | ($175,374) |
| Memphis | $ 18,382 |
| Milwaukee | $112,773 |
| Orlando | $ 84,314 |
| Raleigh | $148,425 |
| Rochester | $175,235 |
| San Antonio | ($108,136) |
| San Diego | $ 59,299 |

Herda Dec. ¶ 40.

In early 1997, Tveter came to the conclusion that plaintiff "was not the right person for the ... Director of Sales and Marketing position as it had evolved because I needed someone with pure sales experience who could generate the sales volume being demanded by Herda and McPhie." Tveter Dec. ¶ 22. On February 25, 1997, Tveter sent plaintiff a memorandum discussing concerns that a particular product, Digital Video Performance, was falling short of expected revenues, that the capital budget for the entire year had been exhausted, and that no more capital would be approved. Tveter requested that plaintiff submit a sales plan. Tveter Dec. ¶¶ 20–21, Exhibit D. Plaintiff claims that he did not understand the rationale behind this memorandum. Plaintiff claims that Tveter never criticized plaintiff's performance. Gambello Depo. 283–86; Gambello Aff. ¶¶ 15–16. In March 1997, Tveter told McPhie and Herda that plaintiff's lack of pure sales experience, his lack of technical knowledge, and revenue collection problems made it unlikely that he could achieve the sales growth demanded by McPhie and Herda. Tveter Dec. ¶ 24; McPhie Depo. 64; Herda Depo. 99. Before Tveter left in April 1997, Herda asked him for his final recommendation concerning plaintiff. Tveter "informed her that Gambello was not the right person for the job as it had evolved, and I recommended that he be terminated." Tveter Dec. ¶ 25.

McPhie and Herda claim that their personal observations confirmed that plaintiff, as the Director of Sales and Marketing, was primarily responsible for New York's poor sales performance. Herda Dec. ¶ 41; McPhie Depo. 69–71. At an unspecified date, McPhie traveled to New York City, and, upon his return, told Herda about the negative work environment and the poor leadership. He told Herda that he was unimpressed with plaintiff and that he was probably not the right person for the job. Herda Depo. 80–83, 106–09. After joining TWTC in March 1997, Herda traveled to all the local offices to meet and assess employees. At dinner, Herda asked plaintiff the price of a competitor's product, a "T–1," and plaintiff did not know the answer. Herda "was amazed, because it was a fundamental question. Anyone selling T–1s in the city should know, and it was reflective, in my opinion, of someone not knowledgeable as to what the competitive environment was." Herda Depo. 71, 83, 91; Tveter Dec. ¶ 23. When Herda returned to Denver, she informed McPhie that she had a negative impression of plaintiff's technical knowledge and sales ability, but that she wanted to do some follow-up investigation with employees in

ly high, so Herda investigated and discovered two billing errors of $122,000 and $149,000. She also discovered this included a one-time (non-recurring) fee of $221,000. Herda Dec. ¶ 38.

the New York office.  McPhie Depo. 73, 76–78.

As part of the follow-up investigation, Herda discussed with plaintiff plaintiff's failure to properly prepare the weekly sales reports on several occasions, but plaintiff could not get the reports correctly prepared.  Herda Depo. 32–33.  Herda also interviewed plaintiff for Tveter's General Manager position in May or June 1997 following Tveter's departure.  At the interview, the two discussed plaintiff's qualifications, and Herda told plaintiff she thought it was unusual that he thought that he would qualify for the General Manager position when the city for which he was Director of Sales and Marketing was not meeting its sales numbers.  Herda Depo. 33, 98.

Herda hired Mark Lipford, the General Manager of the Rochester office, to be the interim General Manager of the New York City office because Lipford had a good record of producing results, New York City was an important market, and Herda wanted to see if New York City could produce higher sales with a strong manager.  After supervising plaintiff, Lipford informed McPhie and Herda that plaintiff was not the right person for the position because he lacked the requisite technical and sales skills, and recommended that he should be fired.  Bob Gaskins, TWTC's Regional Director of Operations, concurred that plaintiff lacked the qualifications to be a successful Director of Sales and Marketing.  Gambello Depo. 214; Herda Depo. 80–83, 106–09; Lipford Depo. 38–39.

On July 25, 1997, Lipford informed plaintiff that his employment was being terminated.  Lipford told plaintiff that "the sales and marketing department was being restructured and that [plaintiff's] position was to be terminated."  Plaintiff claims that Lipford never criticized his performance up to that point.  Gambello Depo. 378–80; Gambello Aff. ¶ 17.  Plaintiff was offered a severance package.  Plaintiff admits, in his deposition and in response to a Request for Admission, that he received pension credit for his years of service at Manhattan Cable.  On an internal termination form, Lipford assessed plaintiff's job knowledge and initiative as 3 out of 5, or average, and his attendance and attitude as a 4, or good.  Overall, Lipford assessed plaintiff as 3, or average.  Lipford identified the reason for termination as "restructuring the sales group."  There was a box for "poor job performance" on the termination form, but Lipford did not check this box.  Lipford Depo. 20; Gambello Aff. Ex. D; Gambello Depo. 211;  Margolis Exhibit B.

Herda had made, and McPhie approved, the decision to terminate plaintiff.  McPhie and Herda did not review Tveter's 1994 to 1996 evaluations in making this decision.  Nor did McPhie and Herda review the internal termination form completed by Lipford.  According to Herda, "the reason Mr. Gambello was terminated is a mixture of different things.  Number one was performance, his sales performance;  number two were recommendations made by numerous managers within the company;  number three was my personal observations;  and number four was the restructuring."  Herda Depo. 83, 118–120;  McPhie Depo. 73–75, 92, 95.  According to Herda, pursuant to the centralization of marketing, the position of Director of Sales and Marketing in New York City was eliminated, and the position of Director of Sales was created.  The new position was to be more revenue driven, and did not require any marketing responsibilities.  Six employees had reported to plaintiff when he was terminated as Director of Sales and Marketing.  One of these employees did not report to the new Director of Sales, and the sales support specialists, who had not reported to plain-

tiff, reported to the Director of Sales. Plaintiff was not offered this new position. Herda Depo. 24–25, 41–44; Gambello Depo. 323–24; Sikora Depo. 49–50.

McPhie and Herda hired Christopher Sikora for the position of Director of Sales. He was 31 years old when he was hired, and plaintiff was 56 years old. Sikora took plaintiff's office and telephone extension. Gambello Aff. ¶¶ 19–20. Herda had been discussing hiring Sikora in some capacity since May or June 1997. Defendants claim that Sikora was hired because he had five years of experience in the sales of telecommunication services in New York and New Jersey, and Herda had worked with Sikora at MFS, where Sikora had been a sales manager. Sikora had managed a staff of eight and was the most successful sales manager at MFS. He had been instrumental in making New York one of MFS's most successful markets. Sikora also had strong recommendations from other colleagues at MFS. Under Sikora, New York's recurring revenues increased tenfold from 1997 to 1999. Sikora Depo. 9–13, 17, 20–23, 73; Herda Depo. 16–23, 66–67, 100–101.

Plaintiff asserts that almost all the problems with sales were out of his control. These problems included the lack of support services, products, and fiber optic networks upon which service depended. Plaintiff also claims there was a lack of direction at the national level. After plaintiff was terminated, more products became available, TWAxS increased its sales force, and the potential sales revenue increased because the switch service became fully operational, which allowed for billing on a usage, as opposed to flat, rate. Gambello Aff. ¶¶ 10–13; Behringer Aff. ¶¶ 6–8; Sikora Depo. 53.

Plaintiff also claims that five other older employees were either terminated or pressured to resign. William McLoughlin, a project manager in the Operations Depart-ment, left TWAxS in May 1998 when he was 58 years old because "[b]ased on my age and the direction of the company, I had no future and believed that if I did not resign, I would have been terminated." McLoughlin claims he was treated less favorably and harassed prior to leaving. An employee in his 30s replaced McLoughlin. Charles Pilger, Site Acquisition Manager for TWAxS was terminated in July 1997, when he was 52, but he does not indicate how old his replacement was, and he states that he has "no reason to believe that my age was a factor in the decision to lay me off." William Behringer, a Director of Operations and Engineering, submits an affidavit indicating that three other employees over 50, Ray Verbsky, Bob Rappa, and Terry Voorhees, were terminated and replaced with younger employees. Behringer, McLoughlin, and Pilger claim they believed older employees were being treated less favorably based on their age. The affidavits of Behringer, McLoughlin, and Pilger also state that plaintiff did an excellent job, had a good grasp of the telecommunications market in New York, and worked well with others. Behringer Aff. ¶¶ 3, 9–11; McLoughlin Aff. ¶¶ 2–4, 8; Pilger Aff. ¶¶ 3, 7–8 (May 11, 2000); Pilger Aff. ¶ 2 (Oct. 4, 2000).

## Discussion

### Summary Judgment Standards

Motions for summary judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. *See id.* The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106

S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986). The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> In a discrimination action such as this, it is important to note that [a] victim of discrimination is ... seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence .... Consequently, in a Title VII action, where a defendant's intent and state of mind are placed at issue, summary judgment is ordinarily inappropriate.

*Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir.1991) (citations omitted). On the other hand, "[t]he summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985).

**Plaintiff's Discrimination Claim**

▮ ADEA forbids employers from discriminating against an employee because of that employee's age. 29 U.S.C. §§ 621 *et seq.* The standard of proof governing an employment discrimination claim raised under the New York HRL is the same as the standard of proof for an ADEA claim. *See Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.2001).

Discrimination claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, a plaintiff must prove by a preponderance of the evidence a prima facie case of discrimination. *See Bickerstaff v. Vassar College*, 196 F.3d 435, 446 (2d Cir.1999). In order to establish a prima facie case, a plaintiff must demonstrate that: (1) he belongs to a protected class; (2) he was performing satisfactorily; (3) he was discharged; and (4) the decision to discharge occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class. *See Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994). Once a prima facie case has been established, the employer must articulate a legitimate, non-discriminatory reason for having taken the action of which the plaintiff complains. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp.*, 411 U.S. at 802–03, 93 S.Ct. 1817. If this is done, the burden shifts back to the plaintiff to prove that the allegedly legitimate reason is merely a pretext for discrimination. *See McDonnell Douglas Corp.*, 411 U.S. at 804, 93 S.Ct. 1817. However, "a reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citation omitted); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (holding that the fact-finder may infer discrimination from the falsity of the employer's explanation). In the summary judgment context, *St. Mary's* requires a plaintiff to "establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Pruden-*

*tial Residential Services Ltd., Partnership*, 22 F.3d 1219, 1225 (2d Cir.1994).

In this case, plaintiff, who was age-protected when he was terminated, cannot establish a prima facie case of discrimination because he raises no issue of material fact genuinely in dispute as to his lack of qualifications for the position he was in as that position had developed. The Court of Appeals for the Second Circuit has defined qualifications as:

> the criteria the employer has specified for the position. Thus, in cases of alleged discriminatory discharge, we have occasionally analyzed this element in terms of whether plaintiff shows "satisfactory job performance" at the time of the discharge. Whether job performance was satisfactory depends on the employer's criteria for the performance of the job—not the standards that may seem reasonable to the jury or judge. Absent a showing by the plaintiff that the employer's demands were made in bad faith, an employer who is sued on allegations of age discrimination is not compelled to submit the reasonableness of its employment criteria to the assessment of either judge or jury.

*Thornley v. Penton Publishing, Inc.* 104 F.3d 26, 29 (2d Cir.1997) (citations omitted). Plaintiff was not qualified for the position, with its increased focus on sales, because of his poor sales performance. Even assuming that plaintiff was qualified for the position and thus made out a prima facie case of discrimination, there is no evidence that defendants' legitimate, non-discriminatory reason for terminating plaintiff was a pretext and that age-based discrimination was the motivation for the termination. According to Herda, the person who made the decision to terminate plaintiff, the decision was based on his poor sales performance, recommendations of other managers, his personal observations, and the restructuring that centralized marketing and resulted in a more sales focused position.

It is undisputed that when McPhie and Herda came to TWTC in early 1997, the company faced revenue troubles and that, if revenue did not grow by the end of the year, the company would be liquidated. Thus, they increased their emphasis on revenue growth and attempted to separate the telephony business from the cable business. It is also undisputed that plaintiff's sales in 1996 fell over $2 million short of his projected growth, the largest shortfall in the country, and in the first five months of 1997 plaintiff's sales fell by $175,374, the worst sales growth in the country. At the same time, McPhie and Herda were expecting rapid sales growth as switch service became partially operational. Several top managers, including Tveter, Lipford, and Gaskins, informed Herda and McPhie that plaintiff was responsible for the low sales in New York, and that he was not the "right person" for the position as it had evolved, with its increased sales focus, because of his ties to the cable business, lack of pure sales background, and lack of technical knowledge. Personal meetings between McPhie, Herda and plaintiff also left McPhie and Herda questioning his qualifications.

■ Plaintiff points to seven circumstances which, he argues, show that he was qualified for the position, and that defendants' allegedly neutral reason for terminating him was a pretext. First, plaintiff points to his 1994, 1995, and 1996 evaluations, which indicated that he either met or exceeded requirements, and his large merit pay increase at the end of 1996. However, Tveter, who gave plaintiff these evaluations and this raise, resigned in April 1997, and new management in both New York and the home office in Denver placed a greater emphases on sales. Plaintiff ac-

knowledges that there was a shift in emphasis to improved sales, and:

> a change in management's evaluation of an employee's performance cannot by itself raise an inference of pretext.... In fact, such an inference is even less permissible when a new supervisor is appointed, who is entitled to set his own standards and agenda. *See Beers [v. NYNEX Material Enters. Co.,* 1992 WL 8299, at *11 (S.D.N.Y.1992)]* ("A new manager is allowed to appraise an employee's work according to his or her own expectations, even if those expectations are contrary to a prior manager's expectations.") ....

*Brown v. Time, Inc.,* 1997 WL 231143 * 12 (S.D.N.Y.1997); *Davidson v. Time, Inc.,* 972 F.Supp. 148 (E.D.N.Y.1997). Qualifications are determined by the good faith demands of an employer at the time a termination decision is made. *See Thornley,* 104 F.3d at 29; *Dugan v. Martin Marietta Aerospace,* 760 F.2d 397, 400 (2d Cir.1985). Given the pressure on McPhie and Herda to improve sales quickly, and the structural and personnel changes made to improve sales, there is no evidence that McPhie and Herda used sales volume in bad faith as a pretext for discrimination. For example, plaintiff does not point to any favorable treatment of non-age protected directors with such a poor sales performance.

■ Next, plaintiff points to the facts that no one ever informed him that he was performing poorly or that he was about to be fired prior to his termination. While there is no evidence that anyone explicitly criticized plaintiff's performance, plaintiff knew that he had to meet sales targets and that he was not doing so. In Tveter's 1996 evaluation, he stated that it was crucial that plaintiff meet each monthly sales goal, and plaintiff received monthly sales reports in April, May, and June indicating that he was falling far short of his sales

goals. Tveter also sent plaintiff a memorandum in February 1997 indicating that his sales in a particular product were inadequate. Thus, without spelling it out for plaintiff, defendants made plaintiff aware that he was not meeting expectations. Even if defendants had not made plaintiff aware of his poor performance, they still would be entitled to summary judgment because "the fact that an employee was unaware of [his] employer's dissatisfaction is irrelevant to a court's inquiry on the issue." *Griffin v. Ambika Corp.,* 103 F.Supp.2d 297, 310–11 (S.D.N.Y.2000).

■ Third, plaintiff argues that the differing reasons for his termination given by Lipford and Herda suggest that he was qualified and that defendants' articulated reasons were pretextual. Lipford informed plaintiff orally and in writing that the reason for his termination was restructuring, and Lipford did not check a box indicating that termination was for poor performance. At his deposition, Herda, who made the decision to terminate plaintiff, testified that the decision was based on plaintiff's poor performance and restructuring. However, the reasons given by Lipford and Herda "are supported by strong factual bases and the reasons are not mutually exclusive ...." *Wisdom v. M.A. Hanna Co.,* 978 F.Supp. 1471, 1481 (N.D.Ga.1997), *aff'd.* 141 F.3d 1190 (11th Cir.1998). It is undisputed that defendants restructured the company by centralizing the marketing function in the home office in order to have former marketing and sales departments in the city offices focus more on sales and that plaintiff was not well-suited for this new structure because his sales performance was the worst in the country. Plaintiff relies on Lipford's failure to check a box indicating that plaintiff was terminated because of his poor performance on an employee evaluation form that Herda did not review, but the "fact that [two superiors] weighed

differently the factors supporting the decision to terminate Plaintiff does not render [defendants'] reasons contradictory or inconsistent." *Id.* A reasonable jury could not conclude that the articulated reasons for his termination were pretextual. *See id.; Rice v. Genova Products, Inc.,* 978 F.Supp. 813, 821 (N.D.Ind.1997).

*Zimmermann v. Associates First Capital Corp.,* 251 F.3d 376 (2d Cir.2001), is not to the contrary. In *Zimmermann,* an employer told an employee orally that her termination was based on her poor relationship with a supervisor and not her poor performance, but then listed inferior performance as the reason for termination on the final payroll entry. The Court of Appeals for the Second Circuit affirmed a jury verdict in favor of the employee, reasoning that a reasonable jury could conclude that the asserted reason for termination was pretextual. However, in *Zimmermann,* unlike the present case, there was evidence that both asserted reasons were false. Zimmermann's supervisor testified that he never spoke to anyone about his relationship with plaintiff, and there was no evidence of poor performance. In fact, the employer had destroyed all the records of plaintiff's work performance. *See id.*

■ Fourth, plaintiff points to defendants' failure to invoke a performance plan pursuant to the TWAxS Employee Handbook prior to his termination as evidence of pretext. Plaintiff's counsel claimed at oral argument that the Employee Handbook required defendants to follow a four-step procedure of progressive discipline before terminating plaintiff for work rules violation or for poor performance, but the Employee Handbook does not mention poor performance. It merely states that "Work Rule Violations are usually addressed by the following progressive disciplinary procedure." Plaintiff does not point to any work rule that he is alleged to

have violated, and there is no evidence to suggest that failing to meet sales targets is a work rule violation. Further, the rule is discretionary, not mandatory, and plaintiff has not provided any evidence that, in its application of this rule, plaintiff "was treated any less favorably than any other management employee who was discharged." *Stanojev v. Ebasco Services, Inc.,* 643 F.2d 914, 923 (2d Cir.1981) (holding that a defendants' alleged failure to follow termination procedures does not support a discrimination claim where there is no evidence that the termination procedure was applied differently to protected and non-protected employees); *see also Eng v. Beth Israel Medical Center,* 1995 WL 469704 *3–*4 (S.D.N.Y.1995) (same).

■ Plaintiff also claims, relying on affidavits from his co-workers, that his peers found him to be highly competent and skilled and that other employees believed that they were harassed and fired because of their age. Behringer, McLoughlin, and Pilger, co-workers who did not participate in the decision to terminate plaintiff, claim that plaintiff did an excellent job, had a good grasp of the telecommunications market in New York, and worked well with others. However, this court must focus on the perceptions of the decisionmakers, and the evaluations of Behringer, McLoughlin, and Pilger alone are insufficient raise a genuine issue of fact. *See Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1223 (7th Cir.1980), *cert. denied* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981); *Acampora v. Konica Business Machines USA, Inc.,* 1997 WL 214800 *7 (E.D.Pa. 1997). Moreover, Behringer, McLoughlin, and Pilger do not refute the grounds upon which plaintiff was terminated, his failure to meet sales targets. Rather, they describe his other qualities and explain why he failed to achieve his sales targets.

■ Behringer, McLoughlin, and Pilger's claims of discrimination also fail to

establish pretext. Their affidavits indicate that four age-protected employees besides plaintiff were terminated, that three of these four were replaced with younger employees, and one other age-protected employee believes he was forced to resign and was replaced with a younger employee. However, approximately 30 employees were terminated between January and August 1997, and there is no evidence as to how many were pressured to resign. Absent evidence as to the age of the other employees, this court cannot infer that they were over 40. *See McCarthy v. New York City Technical College of City University of New York*, 202 F.3d 161, 165 (2d Cir.2000). Evidence that five out of thirty terminated employees were age-protected, without evidence of the total number of age-protected employees before and after the terminations and the percentage of discharged employees who were age-protected, is insufficient to establish age-discrimination. *See Montana v. First Federal Savings and Loan Association of Rochester*, 869 F.2d 100, 107 (2d Cir.1989) (holding that evidence that an employer found other employment for six male employees, but not for a female plaintiff, without more, does not permit an inference of discrimination where 45 employees were terminated). In addition, the claims by Behringer, McLoughlin, and Pilger that older employees were treated less favorably, without evidence of specific instances to support such allegations, are too general and conclusory to support a claim that McPhie and Herda were motivated by age-based discrimination when they decided to terminate plaintiff. *See Zenni v. Hard Rock Cafe International. Inc.*, 903 F.Supp. 644, 654 (S.D.N.Y.1995).

██ Finally, plaintiff's claim that his poor sales performance was not his fault does not support a claim of pretext. Plain-

tiff attempts to explain that his sales were so low by pointing to the lack of support services, products, and fiber optic networks, all of which were out of his control. Plaintiff's explanation:

> may raise issues concerning the reasons *why* [he] failed to perform [his] job . . . . However, this evidence does not raise an issue of fact regarding the overall legitimacy of the proffered explanation. . . . The evidence, even if viewed most favorably to Plaintiff, merely serves to shift the blame for, or rationalize, these incidents to show that the criticism was undeserved. But, faulting others for, or otherwise rationalizing, problems legitimately perceived by [his] employer does not establish pretext. . . . [Plaintiff]'s fundamental disagreement with the conclusions [his] supervisors drew from incidents which [he] admits occurred, and [his] subjective belief that they should not have reflected badly on [his] performance because they were someone else's fault, is not evidence that [his] supervisors' appraisals were a sham, invented to mask discrimination.

*Taylor v. Polygram Records*, 1999 WL 124456 (S.D.N.Y.1999) (emphases in original); *see also McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir.1997) (plaintiff's rationalizations for his tardiness does not demonstrate a genuine issue of material fact as to discrimination); *Davidson*, 972 F.Supp. at 153.

### Breach of Contract Claim

██ Plaintiff's claim that defendants breached oral promises to allow him to work until he retired, to credit his years of service at Manhattan Cable, and to give him a Vice–President position is also subject to dismissal. First, plaintiff fails to establish that defendants agreed to employ plaintiff until he retired. Under New York law,[6] there is a rebuttable presump-

---

**6.** It is undisputed that plaintiff's breach of    contract and misrepresentation claims are

tion that employment is at will, meaning an employee may be freely terminated at any time for any or no reason, if the employment term is indefinite or undefined. *See Rooney v. Tyson,* 91 N.Y.2d 685, 689–90, 674 N.Y.S.2d 616, 697 N.E.2d 571 (1998); *Wieder v. Skala,* 80 N.Y.2d 628, 633, 593 N.Y.S.2d 752, 609 N.E.2d 105 (1992). Plaintiff, citing to *Rooney,* claims that his employment was for a specific duration. In *Rooney,* the New York Court of Appeals held that an oral contract between a boxer and a trainer that the trainer could train the boxer for as long as the boxer fights professionally was for a specific duration. However, *Rooney* reaffirms "the tradition that has wisely guided the careful progression of the at-will doctrine and its application in particular circumstances." *Rooney,* 91 N.Y.2d at 694, 674 N.Y.S.2d 616, 697 N.E.2d 571. Even if plaintiff is correct that, after *Rooney,* an agreement to be employed until retirement is for a specific duration, plaintiff in this case claims that he agreed to work until retirement, provided performance warranted such a term. Unlike in *Rooney,* this durational term is not "legally and experientially limited and ascertainable by objective benchmarks." *Id.* at 692, 674 N.Y.S.2d 616, 697 N.E.2d 571. Even plaintiff, in a Request for Admission, recognizes that his "employment was not of a specific duration." Margolis Exhibit I. Therefore, plaintiff was an at will employee.

Even if plaintiff and defendants had orally agreed that plaintiff would not be an at will employee, plaintiff "could not have reasonably relied on any such oral promise since [he] signed [his] employment application which stated clearly that [his] employment was at will and that no oral promises could vary that." *Burger v. Litton Industries, Inc.,* 1996 WL 421449 * 22 (S.D.N.Y. 1996), *adopted* 1996 WL 609421 (S.D.N.Y.

governed by New York law.

1996). The employee handbook also indicated that plaintiff was an at will employee.

Moreover, even if an oral agreement made under these circumstances could be enforceable, plaintiff has not shown that such an agreement was ever reached. The sole evidence of an oral agreement to be employed until retirement is that plaintiff said "this is the company that I would like to retire from" and Rosenblum, but not Tveter, nodded his head "in approval." Under these circumstances, where an employee merely states his hopes without proposing that he be employed until retirement or inquiring whether the employer agrees, a nodding of the head without more is insufficient to establish that an agreement was reached. *See Cleveland Wrecking Co. v. Hercules Construction Corp.,* 23 F.Supp.2d 287 (E.D.N.Y.1998), *aff'd* 198 F.3d 233 (2d. Cir.1999) (holding that evidence of a handshake is insufficient to establish an agreement). Finally, even if plaintiff's "general sense" that Rosenblum and Tveter agreed to employ plaintiff until retirement constituted a contract, there is no evidence of breach. Plaintiff concedes that this contract was "as long as performance warranted that kind of thing."

■ Plaintiff, citing to *Wieder v. Skala,* 80 N.Y.2d 628, 593 N.Y.S.2d 752, 609 N.E.2d 105 (1992), argues that defendants breached an implied covenant of good faith. "New York does recognize that in appropriate circumstances an obligation of good faith and fair dealing on the part of a party to a contract may be implied and, if implied, will be enforced. *In such instances the implied obligation is in aid and furtherance of other terms of the agreement of the parties. No obligation can be implied, however, which would be inconsistent with other terms of the con-*

*tractual relationship.*" *Id.* at 634, 593 N.Y.S.2d 752, 609 N.E.2d 105 (citation omitted) (emphasis in original). Plaintiff fails to establish that defendants breached a good faith obligation not to terminate plaintiff under this standard.

In *Wieder*, the New York Court of Appeals held that implying an obligation that a law firm not terminate a lawyer for "whistle-blowing" was not inconsistent with the term that a plaintiff is an at will employee. *Wieder* recognized that previous Court of Appeal decisions had held that implying a covenant of good faith limiting the power of an employer to terminate a manager for whistle-blowing was inconsistent with the at will term of the manager's employment contract. *See Murphy v. American Home Products Corp.* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983); *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 335, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987). However, *Wieder* distinguished *Murphy* and *Sabetay* by noting that:

> The defendants in those cases were large manufacturing concerns—not law firms engaged with their employee in a common professional enterprise, as here. In neither *Murphy* nor *Sabetay* was the plaintiff required to act in a way that subverted the core purpose of the employment. The company rules underlying the firing of *Murphy* and *Sabetay* were not, as in this case, general rules of conduct and ethical standards governing both plaintiff and defendants in carrying out the sole aim of their joint enterprise, the practice of their profession. Unlike *Murphy* and *Sabetay,* giving effect to an implied understanding—that in their common endeavor of providing legal services plaintiff and the firm would comply with the governing rules and standards and that the firm would not act in any way to impede or discourage plaintiff's compliance—would be "in aid and furtherance of the central purpose of the

agreement." Thus, the case is distinguishable from *Murphy* and *Sabetay* where giving effect to the implied obligation would have been 'inconsistent with' and 'destructive of' an essential term in the agreement.

*Id.* at 638, 514 N.Y.S.2d 209, 506 N.E.2d 919; *see also Smith v. AVSC Intern., Inc.,* 148 F.Supp.2d 302, 314 (S.D.N.Y.2001) (noting that "New York courts are loath to imply terms relating to professional ethical obligations in at-will contracts, with the limited exception of lawyers in law firms."). Plaintiff has failed to allege that defendants required him to violate any professional obligations, let alone obligations akin to the unique rules governing attorneys. Therefore, *Wieder*'s holding regarding whether an implied covenant is inconsistent with the at will term of an employment contract is inapplicable.

Plaintiff also claims that, at the same meeting, Rosenblum and Tveter promised that, if sales volume warranted it, the Director position could become a Vice–President position. This alleged agreement is too vague and uncertain to be enforceable. *See Holzer v. Kaplan,* 1991 WL 230623 *2 (S.D.N.Y.1991) (holding that an alleged oral partnership agreement where no material terms were defined was too vague and uncertain to be enforceable). It contains no time-frame for the change in position. *See Keough v. Texaco, Inc.,* 1999 WL 61836 *9–*10 (S.D.N.Y.1999) (holding that promises that employment would be "long-standing" and that plaintiff was "in-line to be the next chief executive officer" were too indefinite as to time to be enforceable under a promissory estoppel theory). Further, there is no agreement as to what volume of sales would justify the change, and, even if the sales volume were defined, the agreement is only that the Director position *could* develop into a Vice–President position. Thus, the supposed agreement was far too indefinite to be enforceable.

Finally, plaintiff's claim that defendants breached their promise to "bridge" his years of service at Manhattan Cable lacks merit because it is undisputed that defendants did not breach this promise but in fact fulfilled it. Plaintiff testified that he used the term "bridging of service" to mean that his "eight years of prior employment with Manhattan Cable ... would count toward [his] pension benefits with Time Warner AxS." Further, plaintiff testified that this was the only meaning he attached to the term, responding affirmatively to the question "[i]s that entirely what you meant by bridging of service?" Plaintiff admits, at his deposition and in response to a Request for Admission, that he was given pension credit for his prior service with Manhattan Cable. Gambello Depo. 141–42, 211; Margolis Ex. B.

In opposition to defendants' motion for summary judgment, plaintiff submits an affidavit in which he states, "[a]lthough Mr. Rosenblum told me that I would be given credit for my years of service at Manhattan Cable, I did *not* receive credit in the severance pay I was offered." Gambello Aff. ¶ 19. Contrary to plaintiff's argument, this affidavit does not state anything about how plaintiff understood the term "bridging of service" or for what he would receive credit. More importantly, any claim that plaintiff understood that he would receive credit towards his severance pay would be inconsistent with his deposition testimony, which states that the only thing he meant by bridging of service was to receive credit towards his pension benefits, and "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts an affi-

ant's previous deposition testimony." *Hayes v. New York City Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).[7]

### Misrepresentation Claim

As an initial matter, defendants argue that plaintiff's misrepresentation claim should be dismissed because it is duplicative of his breach of contract claim. Where a fraud claim is premised upon an alleged breach of contractual duties, and the supporting allegations do not concern representations that are collateral or extraneous to the contract, a claim for fraud will not lie. *See Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 19–20 (2d Cir.1996), *citing McKernin v. Fanny Farmer Candy Shops, Inc.*, 176 A.D.2d 233, 234, 574 N.Y.S.2d 58 (2d Dept.1991). However, "under New York law it is elementary that where a contract or transaction was induced by false representations, the representations and the contract are distinct and separable .... Thus, fraud in the inducement of a written contract is not merged therein so as to preclude an action for fraud." *Stewart v. Jackson & Nash*, 976 F.2d 86, 88–89 (2d Cir.1992) (quotation omitted). Thus, as in *Stewart*, plaintiff's claim that defendants made fraudulent claims about future structural changes and employment opportunities is not merged into his contract claim. *See id.*

However, plaintiff has not raised a genuine issue of material fact that defendants made misrepresentations to him. Under New York law, the elements of intentional misrepresentation are that 1) the defendants made a material false representation; 2) the defendants intended to defraud the plaintiff thereby; 3) the plain-

---

7. Plaintiff's declaration also states that both Rosenblum and Tveter "assured me that this was a permanent position, and that the Director's position they were offering me would eventually develop in to a Vice President's position." Gambello Aff. ¶ 6. To the extent that these characterizations of the interchange between plaintiff and Rosenblum and Tveter contradict his deposition, they likewise do not create an issue of fact.

tiff reasonably relied upon the representation; and 4) the plaintiff suffered damages as a result of such reliance. *Bridgestone/Firestone, Inc.*, 98 F.3d at 19; *Murray v. Xerox Corp.*, 811 F.2d 118, 121 (2d Cir.1987). Failure to perform promises of future acts is not fraud unless there exists an intent not to comply with the promise at the time the promise is made. *Murray*, 811 F.2d at 121; *Landes v. Sullivan*, 235 A.D.2d 657, 660, 651 N.Y.S.2d 731 (3rd Dept.1997).

■ In the present case, all alleged misrepresentations relate to promises of future actions: that plaintiff could work until retirement, that the Director position could develop into a Vice–President position if sales permitted, and that his years of service at Manhattan Cable would count toward plaintiff's pension. *See Stewart*, 976 F.2d at 89 (holding that a promise to an attorney that if she came to a firm, she would head the environmental law department is a promise of future action, but denying defendants' a motion to dismiss because plaintiff alleged that defendants did not intend to perform at the time the promise was made). As in *Murray*, plaintiff:

> has failed to offer evidence of fraudulent intent. The sole basis upon which [plaintiff] rests his claim is [defendants] purported failure to follow through on the promise[s]. No other evidence is offered which indicates that [Tveter and Rosenblum] did not intend to comply with [their] promise from its inception. Without such evidence, a showing of fraudulent intent fails as a matter of law.

*Murray*, 811 F.2d at 121 (granting summary judgment on a fraudulent misrepresentation claim where an employee claimed an employer promised to promote and transfer the employee if he took a temporary position, and the employee presented no evidence of intent).

**Rule 11  Sanctions**

■ In a separate motion, defendants seek sanctions against "plaintiff or his counsel" pursuant to Fed.R.Civ.P. 11 on the breach of contract and misrepresentation claims, arguing that these claims lack both legal and factual bases. They seek reasonable attorneys' fees expended in defending against these claims. Rule 11 provides that:

> **(b) Representations to Court.** By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, -
>
> \*        \*        \*        \*        \*        \*
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery;
>
> \*        \*        \*        \*        \*        \*

**(c) Sanctions.** If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

**(1) How Initiated**

  **(A) By Motion.** A motion for sanctions under this rule shall be

made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected.

Sanctions may not be imposed unless an allegation is utterly lacking in support, but, if it is clear that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands, sanctions are appropriate. *See Gurary v. Winehouse*, 235 F.3d 792, 797–98 (2d Cir.2000), *cert. denied* — U.S. ——, 122 S.Ct. 66, 151 L.Ed.2d 33(2001); *O'Brien v. Alexander*, 101 F.3d 1479, 1480 (2d Cir.1996). This is an objective, not a subjective, standard "intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments." *Simon DeBartolo Group, L.P. v. Richard E. Jacobs Group, Inc.*, 186 F.3d 157, 166 (2d Cir.1999). Further, a "litigant's obligations with respect to the contents of ... papers are not measured solely as of the time they are filed with or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." *O'Brien*, 101 F.3d at 1480.

I am mindful that, when "dividing the point at which an argument turns from merely 'losing' to losing *and* sanctionable, [the Court of Appeals has] instructed district courts to resolve all doubts in favor of the signer." *Associated Indemnity Corp. v. Fairchild Industries, Inc.*, 961 F.2d 32, 34 (2d Cir.1992). Several of plaintiff's claims fall close to this difficult line, including, as described above, the claims that defendants breached promises to promote him to Vice–President and employ plaintiff until his retirement, and his claim of misrepresentation. I do not resolve whether these claims crossed the line, however, because another claim so clearly did that Rule 11 sanctions are required. That claim is the one that defendants breached a promise to credit plaintiff for his years of service.

As set forth in detail *supra*, a reasonable inquiry conducted prior to filing the Amended Complaint would have shown that the allegation that defendants breached a promise to bridge plaintiff's years of service at Manhattan Cable lacked evidentiary support. Plaintiff testified at his deposition that all he meant when he said defendants had agreed to bridge his years of service at Manhattan Cable was that he would receive credit towards his pension benefits, and he further testified that he did receive that credit towards his pension benefits. These facts, which emerged during plaintiff's deposition, could have been, and should have been, obtained by plaintiff's counsel before bringing the claim, which was made in the amended complaint.

Even on oral argument, when confronted with these facts, plaintiff's lawyer did not deny them, but they refused to withdraw the claim, arguing instead that plaintiff had a claim for breach of contract because his prior years of service were not counted toward his severance, even though plaintiff has never made a claim that defendants had promised such credit. Indeed, they made arguments about what plaintiff "thought" and "believes," which are completely contradicted by his sworn deposition testimony. *See, e.g.*, Transcript of Oral Argument, Feb. 8, 2002, at p. 6, line 8; p. 9 line 19.[8]

---

**8.** Although I am awarding sanctions solely on the basis of this claim, counsel's cavalier atti-

Defendants have complied with the procedural requirements of Rule 11(c)(1)(A). They filed a separate motion for sanctions; and they gave plaintiff over 21 days to withdraw the claims. In a letter dated September 6, 2000, defendants described the specific conduct alleged to violate Rule 11, and plaintiff responded by refusing to withdraw even the pension benefit claim. Plaintiff also did not respond to defendants' Rule 11 motion by withdrawing the claim within 21 days.

Having determined that sanctions are appropriate, this court must determine upon whom sanctions should be imposed. Defendants have offered no reason to impose sanctions on plaintiff. Rather, it is clear that sanctions are appropriately awarded only against counsel because it was incumbent upon counsel to conduct a reasonable inquiry before filing the amended complaint and also to withdraw any claims that became unsupportable later. Robert McCaffery, Esq., of the firm Leib, Kraus, Grispin & Roth, P.C., signed the amended complaint, the memorandum of law in opposition to defendants' summary judgment motion, and the letter refusing to withdraw the offending claim. Both Mr. McCaffery and Walter Leib, Esq., of the same firm, continued to argue the meritless claim at oral argument. In any event, their law firm, Leib, Kraus, Grispin & Roth, P.C., is jointly liable for the sanction because, "[a]bsent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employ-

ees." Fed.R.Civ.P. 11(c)(1)(A). There is no evidence of exceptional circumstances in this case.

■ Finally, this court must determine what sanctions to impose. Upon finding a violation of Rule 11, courts have discretion to impose penalties "limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Fed.R.Civ.P. 11(c)(2); *Simon DeBartolo Group, L.P.*, 186 F.3d at 166. Although attorneys' fees to the movant are authorized, here the purposes of Rule 11 would not be well-served by such an award because of the complications of determining the incremental expense caused to defendant by the particular conduct found sanctionable. Also, the satellite litigation likely to ensue would not be necessary to accomplish the deterrent purposes of Rule 11. Rather plaintiff's counsel, Robert McCaffery, Esq. and Walter Leib, Esq., and their firm, Leib, Kraus, Grispin & Roth, P.C., are ordered to pay $1,000.00 as a penalty to the Clerk of Court. This penalty will be sufficient to satisfy the purposes of Rule 11.

### Conclusion

In sum, plaintiff has failed to raise a material issue of fact to show that defendants discriminated against him based on his age, breached a contract, or engaged in misrepresentation. Therefore defendants' motion for summary judgment dismissing all of plaintiff's claims is granted. The Clerk of Court is directed to enter judg-

---

tude towards record facts emerged as to other claims as well. For example, counsel argued that defendants had a system of progressive discipline that applied not only to work rule violations, but also to unsatisfactory performance. Transcript of Oral Argument p. 20, lines 20 *et seq.* In fact, the progressive discipline procedures applied only to work rule violations. This point is significant because plaintiff was not charged with any work rule

violations, rather with unsatisfactory performance. *See* discussion *supra* at p. 223. In essence, plaintiff's counsel emphasized on oral argument that plaintiff was a sympathetic person and that the jury should determine credibility, but resisted responding to the specific undisputed evidence and legal principles upon which defendants' motion for summary judgment was based.

ment for defendants. Defendants' motion for sanctions pursuant to Rule 11 is granted to the extent indicated, and plaintiff's counsel, Robert McCaffery, Esq. and Walter Leib, Esq., and their firm of Leib, Kraus, Grispin & Roth, P.C. are ordered jointly to pay a penalty in the amount of $1,000.00 to the Clerk of Court within 30 days of the date of this order.

SO ORDERED.