**Deborah ZIMMERMANN,**
**Plaintiff–Appellee,**

v.

**ASSOCIATES FIRST CAPITAL CORPORATION, a/k/a Associates Consumer Finance, Associates Financial Services, Inc., its subsidiaries and affiliates, Defendants–Appellants.**

No. 00–9155.

United States Court of Appeals,
Second Circuit.

Argued March 19, 2001.

Decided May 31, 2001.

Kelly Michael Hundley, (J. Lewis Sapp, Alisa L. Pittman, Elarbee, Thompson & Trapnell, LLP, Atlanta, GA, on the brief), for defendants-appellants.

Louis D. Stober, Jr., (Stephen G. Walko, Garden City, NY, on the brief), for plaintiff-appellee.

Before FEINBERG, JON O. NEWMAN and SACK, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

This appeal in a Title VII case primarily concerns the recurring issue of whether a record that includes evidence supporting a plaintiff's *prima facie* case and permitting an inference that an employer's proffered justification for adverse employment action was pretextual sufficed to support a jury's finding of discrimination. Associates Financial Services Co. ("AFSC") and its affiliated companies (collectively "the Defendant") appeal from the November 8, 2000, judgment of the District Court for the Eastern District of New York (Arthur D. Spatt, District Judge), entered on a jury verdict in favor of Deborah Zimmermann, awarding her back pay and compensatory and punitive damages. AFSC challenges the sufficiency of the evidence to establish liability, the propriety of a "missing evidence" jury instruction, and the permissibility of punitive damages. On the basis of the particular facts and circumstances shown by the record, we affirm.

## Facts

*Zimmermann's duties.* AFSC hired Zimmermann in April 1996 as an Assistant Vice–President of Business Development Director ("BDD"). AFSC markets financing services to "dealers" (the term AFSC uses for retailers like Laz–E–Boy or PC Warehouse), who then offer the services to their customers. Willing customers of an AFSC-affiliated dealer can have their purchase financed by AFSC, who will pay the dealer an item's purchase price and collect monthly payments from the customer. AFSC operates hundreds of "branches" to administer the installment payments.

The BDD's job is to sign up dealers for AFSC's programs. During the period relevant to this litigation, there were fourteen BDDs, each with his or her own geographic region. Zimmermann's region encompassed the northeastern United States, and was one of the busiest. She had decades of experience selling financial services to dealers before joining AFSC, and was recruited from one of AFSC's competitors by Vice–President Brad Noel and Senior Vice–President Steve DiUbaldo.

The BDDs were supervised by the Operations Vice–President of Retail Sales Finance ("OVP"). When Zimmermann started with AFSC, the OVP was Noel. A month later, Michael Gundy became her supervisor, and remained so for the next eleven months. Zimmermann worked out of her home, faxing weekly progress reports to the OVPs.

In April 1997, AFSC began offering a revolving credit plan, called "A Charge," in which a dealer provides its customers with a reusable charge card for purchases at the dealer's store. At the same time, AFSC hired Stephen Haslam as the new OVP. Under the previous installment payment financing program (called "ATP"), BDDs commonly used branch managers to initiate discussions with dealers. For the "A–Charge" program, Haslam expected BDDs to take a more pro-active role, contacting dealers themselves in the first instance. Zimmermann testified that she had long found working through branch managers clumsy, and that even under the old ATP program she had contacted dealers on her own.

Haslam talked to the BDDs on the phone, organized teleconferences in which BDDs would engage in role-playing and discuss marketing strategies, and distributed a Dun & Bradstreet report to the BDDs. Haslam expected BDDs to "cold call" dealers on the Dun & Bradstreet list. Haslam asked the BDDs to send him appointment lists, solicitation call reports, and pipeline reports each week. From Zimmermann he received handwritten summaries of her appointments and calls

from the previous week, and her anticipated work during the next week.

*Zimmermann's discharge.* Zimmermann worked for Haslam for fewer than two months, during which time she took about two weeks of vacation. On Haslam's fifty-first day, he fired Zimmermann.

Haslam discharged her at a meeting in Dallas to which she was summoned.[1] Zimmermann testified that when she asked Haslam to explain why she was being fired, he insisted that it "had nothing to do with [her] performance," but explained instead that she "didn't have a good relationship" with DiUbaldo, one of her supervisors. However, in DiUbaldo's deposition, which the jury heard, he testified that he did not speak with Haslam about Zimmermann prior to her firing.

Zimmermann's last payroll entry lists "inferior performance" as the reason for her firing. Haslam testified that Zimmermann was not producing results under the "A Charge" program.[2] The evidence was conflicting, but the jury was entitled to credit Zimmermann's testimony that she had a record of success, signing at least 50 to 80 "A–Charges." Zimmermann had exceeded her goals for the second quarter of 1997 by a modest amount (about six percent), earning a performance bonus of $1,635. Zimmermann had also signed, or was close to finalizing, two large dealers to the A–Charge system.

The Texas meeting was the first time Zimmermann had met Haslam. She had never received any warnings or criticism of her performance from Haslam or any other supervisors prior to being fired.

When Haslam signed on as OVP, three of the fourteen BDDs were women. Zimmermann, aged 49 when she was discharged, was replaced by Stephen Mitchell, a slightly younger male. A week after firing Zimmermann, Haslam recommended the termination of another of the three female BDDs, Sheila–Scott Hughes, whom AFSC later transferred to an affiliated company. During the relevant time, no male BDDs were fired.[3]

*Lack of Documentation.* A notable aspect of this case is that AFSC failed to offer a single item of documentary evidence to support its assertion that it fired Zimmermann for inferior performance. Haslam testified that he had no such evidence, claiming that he had thrown out all of the documents relating to the BDDs. Haslam testified that he threw out Zimmermann's documents 30–60 days after firing her. He also acknowledged that he did not contact the other BDDs (many of whom were still employed by AFSC at the time of trial) to see if they had retained

---

1. Haslam was in the New York area talking with Zimmermann's successor about a week before he fired Zimmermann, and knew then that he was going to fire her. Rather than speak to her in Long Island, he returned to Texas and required her to meet with him there. Haslam claimed that he asked her to come to Texas out of courtesy so that the discharge conversation could occur away from a workplace surrounded by co-employees. However, the next week he fired another BDD (also female) by phone.

2. He also testified, somewhat vaguely, that she was not following his so-called "new" methodology in contacting dealers, but no

documents supported such a methodology, and the jury was entitled to find, based on Zimmermann's testimony, that she was using essentially the technique he recommended.

3. Haslam's employment pattern was not consistently anti-female. In December 1997, he promoted the third female BDD to a vice-president position supervising some of the other BDDs, and accepted her recommendation of a female to replace her. The jury was entitled to consider whether these circumstances tended to negative gender discrimination on his part or to be preparation for a defense to it.

their copies of any of these documents. He was evasive when asked how many of the BDDs attained their goals in the second quarter of 1997, what any of those goals were, or how many sales the BDDs achieved, essentially testifying that he could not remember. Haslam also testified that he no longer had any of his training documents from the period in question. Finally, Haslam testified that sales volume figures were kept at AFSC headquarters in Salt Lake City, and that he would occasionally access these figures to track BDDs' productivity, but he said that he did not generate any of these documents for litigation.

Zimmermann kept copies of her own weekly and monthly reports, as well as her bonus statements, and submitted these into evidence. Her counsel repeatedly emphasized during summation the Defendant's failure to produce evidence. The Court gave the jury a "missing evidence" instruction, which we consider below.

*Litigation.* Zimmermann filed a charge with the EEOC, alleging that she was terminated because of her sex and age. After receiving a right-to-sue letter, she filed a timely action against AFSC in the Eastern District of New York. The complaint alleged that Haslam and AFSC discriminated against Zimmermann on the basis of creed, national origin, age, and sex, in violation of Title VII and state discrimination law. The complaint also contained state tort claims.

Zimmermann abandoned the creed and national origin claims before trial and dropped the tort claims at the close of her case. In addition, after both sides presented their cases, the Court granted the Defendant's motion for judgment as a matter of law as to the age discrimination claim, but denied its motion as to Zimmermann's sex discrimination claim and her request for punitive damages.

The Court permitted the sex discrimination claim to go forward because "three out of the 14 [BDDs] were women," and they "initially discharged two," and the "evidence of your nondiscriminatory reason is very, very shaky." The Court agreed to include a "missing evidence" instruction, permitting the jury to infer that missing evidence in the Defendant's control would have been unfavorable to it. The Court justified the instruction because "here you have a situation where your client destroyed every single record." After the jury verdict, Judge Spatt noted that "this is the only case that I have presided over where the defendant has no records whatsoever—on this woman or her performance."

The jury returned a verdict for Zimmermann on the sole remaining claim of gender discrimination, awarding $165,000 in back pay, $50,000 in compensatory damages, and $1,000,000 in punitive damages. The Court reduced the back pay by the amount the jury concluded Zimmermann had failed to mitigate and reduced the punitive damages to the relevant statutory cap of $300,000, *see* 42 U.S.C. § 1981a. After awarding attorney's fees, costs, and pre-judgment interest on the back pay award, the Court entered judgment for the Plaintiff in a total amount of $452,979.

## Discussion

I. Sufficiency of the Evidence of Gender Discrimination

A. *Prima Facie* Case

The Defendant first disputes that the Plaintiff met her burden of presenting a *prima facie* case sufficient to oblige it to explain its adverse action. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Specifically, the Defendant contends that the Plaintiff failed to meet

the requirement of showing that adverse employment action "occurred under circumstances giving rise to an inference of discrimination." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000). This argument is unavailing. We have characterized the evidence necessary to satisfy this initial burden as "minimal" and "*de minimis*," *see, e.g., Byrnie v. Town of Cromwell*, 243 F.3d 93, 101 (2d Cir.2001); *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir.2001), and the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title VII analysis, *see Tarshis v. Riese Organization*, 211 F.3d 30, 36 (2d Cir.2000); *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1239 (2d Cir.1995).

### B. Inference of Discrimination from *Prima Facie* Case and Pretext

■ The evidence in this case plainly permitted the jury to infer that the Defendant's proffered reason for her discharge—deficient work performance—was pretextual. Therefore, the issue as to the sufficiency of the evidence is whether the record as a whole, including whatever reasonable inference the jury could draw from the proffer of a false reason for the discharge, permitted the required ultimate finding of discrimination. *Reeves* instructed that the combination of evidence establishing a *prima facie* case and evidence showing that a proffered explanation was pretextual is neither always to be deemed sufficient, *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097, nor always to be deemed insufficient, *id.* at 146–47, 120 S.Ct. 2097. *Reeves* recommended a case-specific approach, urging a reviewing court to consider a number of factors including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Id.* at 148–49, 120 S.Ct. 2097.

*Reeves* recognized that in some circumstances a defendant could prevail as a matter of law even after a plaintiff's showing of pretext and offered two scenarios as examples. One is where the record "conclusively revealed some other, nondiscriminatory reason for the employer's decision," *Id.* at 148, 120 S.Ct. 2097; *see also Woods v. Friction Materials, Inc.*, 30 F.3d 255, 261 n. 3 (1st Cir.1994) (suggesting example of pretextual reason for a discharge conclusively shown to have been proffered to hide the real reason-preventing employee's disclosure of employer's embezzlement). A second is where the "plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097. Justice Ginsburg expressed the view that "circumstances in which plaintiffs will be required to submit evidence beyond" evidence establishing a *prima facie* case and evidence permitting a finding that a proffered explanation was false "in order to survive a motion for judgment as a matter of law ... will be uncommon." *Id.* at 154, 120 S.Ct. 2097 (Ginsburg, J., concurring).

Since *Reeves*, the case law has been developing as to what sort of a record will permit a plaintiff who presents evidence of a *prima facie* case and evidence of a pretext to have a jury consider the ultimate issue of discrimination and what sort of record will entitle a defendant to judgment as a matter of law. The Fifth Circuit appears to understand *Reeves* to mean that a *prima facie* case and evidence of pretext take a case to a jury in the absence of "*unusual circumstances*" that would pre-

vent a rational fact-finder from concluding that the employer's reasons for failing to promote her were discriminatory and in violation of Title VII." *Blow v. City of San Antonio,* 236 F.3d 293, 298 (5th Cir.2001) (emphasis added); *see also Evans v. City of Bishop,* 238 F.3d 586, 592 (5th Cir.2000) (noting that the "Supreme Court in *Reeves* emphasized the importance of jury fact finding and reiterated that evidence of the prima facie case plus pretext may, *and usually does,* establish sufficient evidence for a jury to find discrimination.") (emphasis added). The Fourth Circuit has observed that if the plaintiff proves a *prima facie* case and pretext, her claim must go to a jury unless "there is evidence that precludes a finding of discrimination." *Rowe v. Marley Co.,* 233 F.3d 825, 830 (4th Cir.2000).

Our Circuit has not read *Reeves* quite so favorably to Title VII plaintiffs. Without insisting on unusual circumstances or evidence precluding a finding of discrimination, as the Fourth and Fifth Circuits have done, we have simply ruled in several cases that a record that included evidence of a *prima facie* case and evidence permitting a finding of pretext did not suffice to permit a finding of discrimination. *See Slattery v. Swiss Reinsurance America Corp.,* 248 F.3d 87, 94 (2d Cir.2001); *James v. New York Racing Ass'n,* 233 F.3d 149, 157 (2d Cir.2000); *Schnabel v. Abramson,* 232 F.3d 83, 91 (2d Cir.2000). The task, as outlined in these decisions, is to examine the entire record and, in accordance with *Reeves,* make the case-specific assessment as to whether a finding of discrimination may reasonably be made. *Slattery* noted that "the Supreme Court

has indicated that only occasionally will a *prima facie* case plus pretext fall short of the burden a plaintiff carries to reach a jury on the ultimate question of discrimination" but that "such occasions do exist." *Slattery,* 248 F.3d at 94 (citing *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097).

Apart from the inference reasonably to be drawn from the Defendant's pretextual justification for the discharge, Zimmermann's evidence of discrimination, beyond her *prima facie* case, is slight. She emphasizes that of the three female BDDs, Haslam endeavored to fire two, succeeding with Zimmerman and eventually being overruled internally as to Scott–Hughes, who was rehired in a different position.[4] We have previously cautioned against attributing much if any significance to the fact that another member of the protected class was discharged along with the plaintiff, *see McCarthy v. New York City Technical College,* 202 F.3d 161, 165 (2d Cir. 2000), especially where the numbers involved are small, *id.; see also Pollis v. New School for Social Research,* 132 F.3d 115, 121–22 (2d Cir.1997). However, Zimmermann's numerical evidence is stronger than that in *McCarthy* in that Haslam was seeking to discharge two of the only three female BDDs who were employed, and stronger than that in *Pollis* in that Haslam acted within a span of just a few weeks.[5]

Turning to the "probative value of the proof that the employer's explanation is false," *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097, we note that the Plaintiff's evidence is extremely substantial and the Defendant's effort to meet it is woefully inadequate. To the extent that the Defendant proffered Zimmermann's alleged poor per-

---

4. In rejecting the Defendant's motion for judgment as a matter of law, Judge Spatt suggested, but could not be certain, that Scott–Hughes was rehired to provide a defense to Zimmermann's claim.

5. The few employment actions to which the plaintiff in *Pollis* made a comparison were taken over a period of twenty years. *Pollis,* 132 F.3d at 121.

formance as the reason for her discharge, she provided ample evidence of good performance and the complete absence of any negative evaluations. In addition, she testified that when Haslam fired her, he said that the discharge "had nothing to do with [her] performance." Moreover, the Defendant not only failed to present evidence from Zimmermann's personnel file indicating any complaints about her job performance, it also acknowledged that records that would show her productivity and that of other BDDs had been destroyed.

The rationale Haslam gave when he discharged Zimmermann—an allegedly poor relationship with DiUbaldo—was equally unsupported; the supervisor in question had not spoken with Haslam about Zimmermann prior to Haslam's firing her.

> As the Supreme Court noted in *Reeves:* Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.... Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision.

530 U.S. at 147, 120 S.Ct. 2097 (citations omitted). Whether or not we would have drawn an inference of discrimination were we the fact-finders, we agree with Judge Spatt, after our review of the entire record, that in the particular circumstances of this case the jury was entitled to do so.

## II. Missing Evidence Instruction

█ The Defendant challenges the following jury instruction:

> You have heard testimony about records which have not been produced. Counsel for the plaintiff has argued that this evidence was in the defendant's control and would have proven facts material to the matter in controversy.

> If you find that the defendant could have produced these records, and that the records were within their control, and that these records would have been material in deciding facts in dispute in this case, then you are permitted, but not required, to infer that this evidence would have been unfavorable to the defendant.

> In deciding whether to draw this inference you should consider whether the evidence not produced would merely have duplicated other evidence already before you. You may also consider whether the defendant had a reason for not producing this evidence, which was explained to your satisfaction.

We recently considered the availability of an adverse inference from the destruction of records in the context of employment discrimination litigation. *See Byrnie*, 243 F.3d at 107–11. We held that where, as here, the employer was required by law to retain the employee's records, *see* 42 U.S.C. § 2000e–8(c); 29 C.F.R. § 1602.14 (requiring retention for one year after termination), bad faith that might otherwise be required, *see Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998), need not be shown to permit an adverse inference; intentional destruction satisfies the *mens rea* requirement.[6] *Byr-*

---

**6.** The Defendant's argument that there is no evidence of either bad faith or gross negligence sufficient to warrant an adverse infer-
ence instruction is therefore unavailing, even if not waived because asserted for the first

*nie,* 243 F.3d at 109. The only other requirement is that the party seeking the inference show that the destroyed records were relevant to the party's claim or defense. *Id.*

The Defendant contends that the instruction was impermissible because the Plaintiff had the documents (her weekly memos to Haslam) that she alleged the Defendant failed to produce. However, this argument misses the point that the Plaintiff also wanted missing information concerning the other BDDs—their memos, sales figures, etc.—and that this information was critical to her attempt to demonstrate disparate treatment. Demonstrating disparate treatment by comparing one's treatment to that of other similarly situated employees is one of the principal means of showing a Title VII violation. *Abdu–Brisson,* 239 F.3d at 467.

The jury charge permitting an adverse inference was fully warranted.

III.   Punitive Damages

Finally, the Defendant challenges the punitive damages award, arguing that it was not supported by sufficient evidence. We disagree.

■ Punitive damages are available under Title VII in cases where "the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.' " *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 529–30, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (quoting 42 U.S.C.

§ 1981a(b)(1)). Where available, the sum of such damages and damages for future pecuniary losses and nonpecuniary losses is subject to a cap that varies with the size of the employer. 42 U.S.C. § 1981a(b)(3). For an employer as large as AFSC, the cap is $300,000. *Id.* § 1981a(b)(3)(D). In Zimmermann's case, the District Court treated the $50,000 nonpecuniary award as based on her state law claim, thereby exempting this sum from the $300,000 cap. The propriety of such an exemption, which has divided other courts,[7] is not challenged on this appeal, and we do not consider it.

■ The Supreme Court emphasized in *Kolstad* that the statutory terms " 'malice' and 'reckless' ultimately focus on the actor's state of mind." 527 U.S. at 535, 119 S.Ct. 2118. Although "egregious misconduct is evidence of the requisite mental state, § 1981a does not limit plaintiffs to this form of evidence...." *Id.* (citations omitted). What is required is evidence that the employer "discriminate[d] in the face of a perceived risk that its actions [would] violate federal law." *Id.* at 536, 119 S.Ct. 2118. An employer would not have the requisite state of mind if he was "unaware of the relevant federal prohibition" or acted "with the distinct belief that its discrimination is lawful." *Id.* at 537, 119 S.Ct. 2118.

■ *Kolstad* also explicated the criteria for imposing punitive damages liability upon an employer for the malicious or recklessly indifferent discrimination of its agents. Such liability may be imposed "where an employee serving in a 'manage-

time in a reply brief, *see Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999).

7.   *Compare Passantino v. Johnson & Johnson Consumer Products, Inc.,* 212 F.3d 493, 509–10 (9th Cir.2000) (permitting exemption of state law damages); *Martini v. Federal National Mortgage Ass'n,* 178 F.3d 1336, 1349–

50 (D.C.Cir.1999) (same); *Funk v. F & K Supply, Inc.,* 43 F.Supp.2d 205, 225–26 (N.D.N.Y.1999) (same); *Luciano v. Olsten Corp.,* 912 F.Supp. 663, 675–76 (E.D.N.Y. 1996) (same), *with Oliver v. Cole Gift Centers, Inc.,* 85 F.Supp.2d 109, 112–14 (D.Conn. 2000) (prohibiting exemption).

rial capacity' committed the wrong while 'acting in the scope of his employment,'" *id.* at 543 (quoting Restatement (Second) of Agency § 217 C (1957)), unless the agent's "discriminatory employment decisions ... [were] contrary to the employer's good-faith efforts to comply with Title VII," *id.* at 545 (internal quotation marks omitted).

The Defendant challenges liability for punitive damages on the specific ground that although Haslam testified that he was exposed to "human resources training" and training on "hiring practices and equal opportunity," there was no evidence that federal discrimination laws were explicitly discussed at this meeting. Therefore, the argument continues, there was insufficient evidence to permit a jury inference that Haslam knew he was acting with reckless indifference to federally protected rights. However, we agree with Judge Spatt that Haslam's acknowledgment of training in "equal opportunity" permits an inference of the requisite mental state. Whether or not all managers are now chargeable with knowledge of Title VII's clear requirements, as some courts have ruled, *see Di-Marco–Zappa v. Cabanillas,* 238 F.3d 25, 38 (1st Cir.2001) ("The extent of federal statutory and constitutional law preventing discrimination on the basis of ethnicity or race suggests that defendants had to know that such discrimination was illegal."); *Molnar v. Booth,* 229 F.3d 593, 604 (7th Cir.2000) (noting that punitive damages were appropriate because "[t]he events here took place in 1994, long after the law of sexual harassment had become well established by the Supreme Court"), training in "equal opportunity" may now fairly be understood to convey some awareness of Title VII requirements, *see Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1008 (8th Cir. 2000) ("Hudson testified to his familiarity with the policy, and claimed he received 'extensive training on sexual harassment

issues' in conjunction with his M.B.A. A jury could therefore infer Hudson had knowledge of Title VII's proscriptions....").

The Defendant contests the punitive damages award on the additional ground that, as a matter of law, it is entitled to the affirmative defense recognized in *Kolstad,* which insulates an employer from punitive damages liability if it has made "good faith efforts to enforce an antidiscrimination policy." 527 U.S. at 546, 119 S.Ct. 2118; *see Deffenbaugh–Williams v. Wal–Mart Stores, Inc.,* 188 F.3d 278, 286 (5th Cir.1999) (treating good-faith enforcement as affirmative defense). This defense requires an employer to establish both that it had an antidiscrimination policy and made good faith effort to enforce it. *See Passantino v. Johnson & Johnson Consumer Products, Inc.,* 212 F.3d 493, 516–17 (9th Cir.2000); *see also Romano v. U–Haul International,* 233 F.3d 655, 670 (1st Cir.2000) (employer has burden of proof as to *Kolstad* affirmative defense). Where evidence supports both components of the defense, an employer is entitled to have the defense considered by the jury under proper instructions.

In this case, the defense cannot be said to have been established as a matter of law. First, the defense was not submitted to the jury in the charge on punitive damages, and the defendant made no objection to its omission. Even if we assume that we would be entitled, in the absence of a jury instruction, to examine the record to see if the evidence established the defense as a matter of law, *cf. Los Angeles Land Co. v. Brunswick Corp.,* 6 F.3d 1422, 1426 n. 2 (9th Cir.1993) (despite erroneous jury instruction, reviewing court considers record to determine if evidence failed as a matter of law to establish element of *plaintiff's* case), the record is insufficient. The Defendant contends that Haslam's

testimony about training in "equal opportunity" establishes the requisite antidiscrimination policy. Although this testimony suffices to permit a finding of Haslam's awareness of federal law requirements, as the Plaintiff contends, and would be somewhat probative of an antidiscrimination policy, it does not establish as a matter of law the existence of such a policy, much less good faith enforcement of such a policy. *See Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 446 (4th Cir.2000) (written antidiscrimination policy does not automatically establish good faith enforcement). At most, the evidence would have provided some basis for the jury to infer the existence of a policy and its good faith enforcement, had the Defendant properly presented these issues to the jury.

The punitive damages award, as modified by the statutory cap, may stand.

### Conclusion

The judgment of the District Court is affirmed.