**Irsa GREENE, Plaintiff,**

v.

**COACH, INC., Defendant.**

**No. 01 Civ. 0405(NRB).**

United States District Court,
S.D. New York.

July 31, 2002.

Robert L. Levy, Bantle & Levy, LLP, New York, NY, for plaintiff.

Felice B. Ekelman, Jackson Lewis, LLP, Valerie KYM Wilde, Jackson Lewis Schnitzler & Krupman, New York, NY, for defendant.

## OPINION & ORDER

BUCHWALD, District Judge.

Plaintiff Irsa Greene ("Greene" or "plaintiff") brings this action against Coach, Inc. ("Coach" or "defendant"), alleging racial discrimination pursuant to Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Civil Rights Act of 1971, 42 U.S.C. § 1981 ("Section 1981"), New York State Human Rights Law, New York Executive Law § 290 *et seq.* ("NYHRL"), and the New York City Administrative Code § 8–101 *et seq.* ("NYCAC"). Presently before the Court is defendant's motion for summary judgment on liability, or alternatively, to dismiss certain of plaintiff's damages claims. For the following reasons, defendant's motion for summary judgment is denied as is defendant's motion to dismiss plaintiff's claims for punitive damages. However, defendant's motion to dismiss plaintiff's claims for reinstatement, front-pay, and some back-pay is granted.

## BACKGROUND

In brief, the facts are as follows.[1] In November of 1997, Greene, who is Afri-

---

1. Except where noted, the facts are drawn from the parties submissions in connection with this motion, including their affidavits, and Rule 56.1 Statements. As described, the facts are either undisputed or interpreted in the light most favorable to the plaintiff.

can–American, commenced her employment with Coach. She began as a part-time, seasonal salesperson and became a regular employee when she was transferred to the Coach store at 342 Madison Avenue ("the Store") in January of 1998. *See* Greene Aff. ¶¶ 2–3. In December of 1998 Greene was promoted to the position of assistant manager. *See* Levy Aff. Ex. D, Greene Depo. at 153–56. In June of 1999, Lisa Young ("Young"), who is Caucasian, became the New York District Manager. In that position, she had supervisory authority over the Store's operations. On the recommendation of Store manager Melissa Betonte–Middleton ("Betonte–Middleton"), Young promoted Greene to associate manager about one month later.[2] *See* Levy Aff. Ex. X, Betonte–Middleton Depo. at 81–83.

In late September of 1999, Betonte–Middleton announced her resignation as Store manager. *See id.* at 24–25. After gaining Betonte–Middleton's support for her desire to be considered for the Store manager position, Greene twice contacted Young to discuss her candidacy for the position. *See* Greene Aff. ¶ 9. Young told Greene she would meet with her to discuss it. *See id.* ¶¶ 9–10. However, at her deposition, Young explained that she had not considered Greene for the position but rather selected Karen Diaz ("Diaz"), who was then the store manager at Coach's closing Trump Tower location, to be the new store manager. Levy Aff. Ex. U, Young Depo. at 126. Further, Young transferred Raquel Cruz ("Cruz"), a recently hired assistant manager at the Trump Tower location, to fill the position of assistant manager at the Store.[3]

Shortly after the change in management, Diaz took a vacation, leaving Greene as the ranking manager at the Store. *See* Greene Aff. ¶ 11; Levy Aff. Ex. T, Diaz Depo. at 188. In that capacity, Greene continued her cleaning and reorganizing of the stockroom, a project that she had commenced several days earlier with Diaz's knowledge. *See* Greene Aff. ¶ 11. On October 20, 1999, Greene stayed in the store after her scheduled shift ended in order to complete this project. *See id.* ¶ 12. In addition to accumulating garbage, Greene determined that broken glass and wooden shelving that had been stored for weeks against the wall in the Store's small bathroom needed to be removed. As Greene describes this shelving, it was "unuseable and posed a safety hazard to employees and customers using the bathroom." *Id.* She asked a neighboring Verizon store manager, Fernando Carrington ("Carrington"), to come to the store and help to remove the "heavy and unwieldy" shelving. *Id.* While Carrington and Greene removed the shelving, sales associates Elisa Moore ("Moore") and Valencia Joseph ("Joseph"), as well as assistant manager Cruz, were present and aware of what Carrington and Greene were doing. After depositing the shelving in Coach's designated garbage disposal site, Greene closed the store, including following Coach procedures requiring that all employees have their bags checked before departing. *See* Greene Aff. ¶ 13.

Unbeknownst to Greene, upon leaving the store that evening, Cruz called vacationing Store manager Diaz on her cellular phone, to report Carrington's presence in the stockroom. Cruz testified at her deposition that at the time she called Diaz, she was uncertain as to whether Carrington was a Coach employee and was concerned

---

**2.** There were three management positions at the Store; from junior to senior management, these positions were assistant manager, associate manager, and store manager.

**3.** Diaz is Caucasian and Cruz is Latina. *See* Levy Aff. Ex. BB, Moore Depo at 133.

because he was in the stockroom. According to Cruz's deposition testimony, she told Diaz what had happened, though her testimony was confused (at best) as to whether she told Diaz that Greene and Carrington had been left alone in the Store. In supplying further details about the evening of October 20, Cruz testified at her deposition that Carrington and Greene removed the shelving before the store closed to the public, that she did not see Greene and Carrington remove anything other than shelving, and that she had never told anyone that Greene disregarded the bag check policy.

Diaz's version of this same phone conversation is somewhat different. Diaz testified at her deposition that Cruz had told her that Greene invited a non-employee friend into the store and then asked all the other Coach employees to leave while the money from the register was still out, meaning it was neither in the register nor the safe. *See* Wilde Aff. Ex. A, Diaz Depo. at 230. Further, according to Diaz, Cruz said that Greene and Carrington discarded items that were not checked by another member of management pursuant to store policy. *See id.* at 235. After receiving the call from Cruz, Diaz relayed to District Manager Young what had transpired at the Store. Pursuant to Young's instructions, Diaz then notified Coach's Loss Prevention Department of what Cruz had reported to her.

On October 28, 1999, Regional Loss Prevention Investigator Paul DeMasi ("DeMasi") met with Greene in the stockroom at the Store. First, according to Greene, DeMasi accused her of being responsible for a $400 cash discrepancy that had occurred on a day when Greene was not working at the Store. After more than three hours of interrogation, DeMasi was unable to connect Greene to the discrepancy. Greene Aff. ¶ 14; Levy Aff. Ex. S, Greene Depo. at 335–36. Then, Director of Loss Preven-

tion Daniel Hafford ("Hafford") came into the stockroom. Hafford and DeMasi informed Greene that they had investigated her actions in allowing Carrington into the stockroom on October 20, and had concluded that she had violated Coach's building access policy. Greene signed a statement acknowledging that allowing an unauthorized person into the work area was a violation of company policy. *See* Levy Aff. Ex. J.

As explained by Young, after DeMasi concluded his investigation, he reported his findings to Young, who then contacted Human Resources representative Noreen McLaughlin ("McLaughlin"). Young told McLaughlin, who had never met Greene and did not know she that she is African–American, about the events of October 20 and informed McLaughlin that both she and DeMasi recommended termination. McLaughlin told Young to "go ahead and terminate." *See* Valenza Aff. Ex. B, Young Depo. at 153–54. Later that same day, Young met with Greene and told her that she was being terminated. *See* Greene Aff. ¶ 17. Although Young testified at her deposition that she told Greene that she was being terminated both for removal of company property as well as allowing an unauthorized person in the stockroom, Greene asserts that Young gave her only the latter reason at the time of termination.

## DISCUSSION

### A. Summary Judgment Standard

Summary judgment is properly granted "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to judgment as a matter of law.'" *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997) (quoting Fed.R.Civ.P. 56(c)).

The Federal Rules of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing the record, we must assess the evidence in "a light most favorable to the nonmoving party" and resolve all ambiguities and "draw all reasonable inferences" in its favor. *American Casualty Co. v. Nordic Leasing, Inc.*, 42 F.3d 725, 728 (2d Cir.1994); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Our inquiry is limited to identifying material issues of fact. *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. We must refrain from resolving such issues or making credibility assessments as these are tasks for a jury. *Id.* at 250, 106 S.Ct. 2505; *Sorlucco v. New York City Police Department*, 888 F.2d 4, 7 (2d Cir.1989).

In *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), the Supreme Court revisited the question of the quantum of proof that a plaintiff must provide in order to survive a summary judgment motion. The Court recommended a case-specific approach stating that a reviewing court should consider factors including, "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case." *Id.* at 148–149, 120 S.Ct. 2097. *Reeves* explains that a defendant's motion for summary judgment can prevail where, "the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* at

148, 147 L.Ed.2d 105. In *Schnabel v. Abramson*, the Second Circuit held that, "the Supreme Court's decision in *Reeves* clearly mandates a case-by-case approach, with a court examining the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" 232 F.3d 83, 90 (2000) (quoting *Reeves*, 530 U.S. 133, 120 S.Ct. 2097).

### B. Title VII Claim

In evaluating plaintiff's claim of racial discrimination, we employ the familiar three-step burden shifting analysis first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105. First, the plaintiff must establish a *prima facie* case of discrimination, *see McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. 1817, by showing (1) "membership in a protected class," (2) "qualification for the position [held]," (3) "adverse employment action," and (4) "circumstances giving rise to an inference of discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 567 (2d Cir.2000); *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Cruz*, 202 F.3d at 567. As the Supreme Court noted in *Reeves*, "[t]his burden is one of production, not persuasion." 530 U.S. at 142, 120 S.Ct. 2097. If the defendant is able to provide a nondiscriminatory basis for the discharge, then the presumption of discrimination "simply drops out of the picture" and the burden once again shifts to the plaintiff to demonstrate, by a preponderance of the evidence, that the employer's presumptively valid

explanation was merely a pretext for discrimination and that the employment action was motivated by discrimination. *Reeves,* 530 U.S. at 143, 120 S.Ct. 2097 (citing, *inter alia, St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 510–511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); *see also McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817.

■ We find both that plaintiff met her burden of establishing a *prima facie* case and that defendant met its burden of producing a legitimate, nondiscriminatory reason for plaintiff's discharge. Given the minimal showing required to establish a *prima facie* case, plaintiff easily meets this standard.[4] *See Tarshis v. Riese Org.,* 211 F.3d 30 (2d Cir.2000) (describing the burden of establishing a *prima facie* case as minimal). It is equally clear that Coach's position that Greene was terminated for both (1) allowing an unauthorized person into the stockroom, and (2) disposing of company property, namely the shelving, in violation of Coach's loss prevention policy, satisfies defendant's burden of producing a legitimate, nondiscriminatory reason for Greene's discharge.[5] As a result, our focus shifts to whether plaintiff has provided sufficient evidence for a fact finder to conclude that defendant's purported rationale was actually a pretext for racial discrimi-

nation and that Greene's termination was motivated by discrimination. Viewing all evidence in the light most favorable to the plaintiff and drawing all reasonable inferences in her favor, we conclude that the existence of material issues of fact as to the reasons for Greene's termination requires the denial of Coach's motion.

### 1. Evidence of Pretext

Greene cites a number of reasons why a factfinder could infer that Coach's proffered reasons for terminating her are pretextual. First, Greene argues that allowing Carrington into the stockroom was not necessarily a violation of Coach policy, and that similar conduct by other employees had not been followed by disciplinary action. Greene and other Store employees testified at their depositions that unauthorized persons were at times allowed into the stockroom and that employees who permitted this were not sanctioned in any way. For example, Betonte–Middleton testified that when she was the manager, her husband sometimes waited in the Stockroom as she closed up the Store. Further, Coach employees testified that it was Store policy to allow customers such as pregnant women and children to use the bathroom located in the Stockroom.

---

**4.** Defendant does not dispute that Greene has satisfied the first three elements of the *prima facie* case, but argues that plaintiff has failed to establish that her termination occurred under circumstances giving rise to an inference of discrimination. We find that Greene has more than adequately established that her termination occurred under circumstances giving rise to an inference of discrimination. Among the evidence supporting this conclusion is: (1) evidence that Greene was terminated for violating a building access policy that was not enforced against similarly situated personnel; (2) inconsistencies in the explanations offered by Coach following Greene's termination; (3) evidence that DeMasi took a less-than-thorough approach to investigating Cruz's report to Diaz of the events of October

20 and the possible misrepresentation of Greene's alleged misconduct to the ultimate decision-maker; and (4) evidence that Young held a negative opinion of Greene and that this opinion was not, as Young claimed, based on negative comments by Betonte–Middleton.

**5.** Coach argues that Greene did not have the authority to decide that the shelving should be discarded and should have obtained the approval of a District Manager. Further, Coach argues that it has no way of knowing what other items may have been removed on October 20 in violation of its policy. According to Coach, these violations, compounded by the policy violation of having a non-employee in the stockroom, comprised the grounds for Greene's termination.

Moreover, Diaz, now a loss prevention investigator, testified that as long as the non-employee is accompanied by an employee, Coach's policy is not violated.

Second, with respect to the question of whether Greene was also discharged for disposing of the shelving without authorization, plaintiff notes that Coach has been inconsistent in relying on unauthorized removal of Coach property as an explanation for Greene's termination. For example, in response to a letter from plaintiff's counsel concerning the reason for Greene's termination, Carole P. Sadler, VP/Chief Counsel at Coach, informed plaintiff in a letter dated March 2, 2000, that she had been terminated for allowing an unauthorized person onto company property and for failure to adhere to the bag check policy.[6] *See* Levy Aff. Ex. M. The letter made no mention of removal of property.

Third, Greene argues that DeMasi's investigation into the incident was a sham. Greene points out that although DeMasi spent a significant amount of time questioning Greene about a $400 overage occurring on a day when Greene was not working, he failed to question either Moore or Joseph, the two African–American sales associates who were present in the store on October 20, about the events leading to Greene's discharge.[7] DeMasi also relied on Diaz's hearsay account of Cruz's narrative rather than questioning Cruz personally about the incident. Greene raises these erroneous conclusions that seem to have surfaced from DeMasi's investigation—such as whether Greene followed the bag check policy and whether she asked the other employees to leave her and Carrington alone in the Store—as support for the inference that either DeMasi's investigation or another source of information in the chain of communication at Coach, was tainted by racial bias.

Coach attacks Greene's argument that similarly situated Caucasian employees were not sanctioned for allowing non-employees into the stockroom. Coach argues that Greene's case is distinguishable because in her case, as opposed to violations by other employees cited by Greene, the decision-makers became aware that the violations had taken place. While this may or may not be true, Coach was still unable to cite any other instances in which it had fired an employee for allowing an unauthorized person into the stockroom.[8] Further, although Coach cites incidents in which it terminated Caucasian employees for removal of company property, these cases do not appear to include any situations in which Coach props or fixtures were removed. Rather, the bulk of Coach's terminations for violations of the loss prevention policy involve product theft and discount abuse, which may be distinguished from the present case. Since

---

**6.** Coach's former position that Greene had failed to adhere to the bag check policy seems to stem from DeMasi's investigation, but Cruz denies ever having reported to Diaz that Greene failed to follow this policy on October 20. It is unclear, therefore, how this allegation came into existence and to what extent it was relied upon by DeMasi and Young in recommending Greene's termination.

**7.** Although DeMasi testified that he spoke with someone named "Elisa", Elisa Moore testified that at no time did she ever speak with DeMasi about alleged misconduct involving Greene. Also, although DeMasi's notes reflect that Greene followed the bag check policy on October 20 and Cruz testified that she had never reported that Greene had failed to adhere to the bag check policy, Coach at one time took the position that Greene was terminated in part for failure to adhere to the bag check exit policy as well. *See supra* n. 6; Levy Aff. Ex. M.

**8.** Coach cites no other cases in which it terminated employees for violations of the building access policy, arguing instead that it likely would not have discharged Greene only for having an employee in the stock room. *See* Deft.'s Mot. at 16.

Greene's termination is therefore distinguishable from the other terminations cited by Coach, we leave it to the factfinder to make the relevant inferences and determine whether racial discrimination played a role in Greene's termination.

## 2. Evidence of Discrimination

In addition to arguing that Coach's proffered reason for Greene's termination is pretextual, Greene cites additional evidence in the record that could lead a factfinder to infer that her termination was tainted with racial bias. As background evidence of a climate of racial discrimination at Coach, Greene points to her own affidavit as well as the affidavits and deposition testimony of sales associates Moore and Joseph that African–American customers are treated differently by Store management, such as through the inequitable administration of return and exchange procedures.[9] The affidavits of Moore and Joseph also suggested that Store management, namely Diaz, praised Caucasian employees disproportionately, gave favorable shifts to Caucasian employees, and failed to punish Caucasian employees who violated company policy.[10] Greene also argues that her own personal advancement at Coach hit a "glass ceiling," citing Young's failure to consider her for the Store manager position as well as an occasion when Greene's shift assignment was changed at the last minute, depriving her of the opportunity to meet with a member of Coach management who was visiting the Store that day. Further, while Young claims to have formed her opinion that Greene is overly confrontational and unwilling to follow directions or take feedback from conversations with Betonte–Middleton, Greene points out that at her deposition, Betonte–Middleton denied ever having communicated to Young such negative comments on Greene's performance. Greene also cites her positive performance reviews as evidence of her competence as a Coach employee. In sum, plaintiff characterizes Young's opinion of her as baseless and racially stereotyped, cites Young's reluctance to promote her, and points to evidence that African–American employees and customers of the Store were given less favorable treatment, as evidence of racial discrimination by Store management.

Coach's principal argument with respect to Greene's allegations of discriminatory conduct is that Greene's proffered evidence of racial bias at the Store cannot be connected to the decision-makers who recommended and effectuated Greene's termination. However, although Coach has offered evidence that McLaughlin did not know that Greene is African–American, McLaughlin authorized Greene's termination based solely on Young's report and DeMasi's investigation, both accounts

---

**9.** Coach has argued that evidence of a climate of racial discrimination at the Store is inadmissible because it is irrelevant to the decision-making process behind Greene's termination. Coach also argues that the opinions of Valencia and Joseph that discrimination played a role in Greene's termination are not based on personal knowledge and are therefore inadmissible. It is unnecessary, at this time, to parse through all the specific incidents and assertions of discrimination described by Moore and Joseph and determine which would be admissible at trial. However, it is clear that some of this evidence is relevant and admissible. For example, testi-mony that African–American employees and customers were treated differently by Diaz in a store that was supervised by Young—given that Diaz and Young were both managers involved in the termination of Greene—is relevant to proving Greene's specific claim of intentional discrimination. *See, e.g., McKenna v. Chilton Co.*, No. 86 Civ. 6707(KMW), 1991 WL 18142, *3 (S.D.N.Y. Feb.6, 1991).

**10.** For example, no disciplinary action was taken when, at some point, Coach learned that Cruz had lied about missing her shift because she was sick.

which were based significantly on Diaz's narrative. As previously discussed, Greene has raised questions of fact regarding the motivations of Young, DeMasi, and Diaz from which a jury could infer discriminatory intent.[11] Since the inference could be made that those employees who counseled McLaughlin to authorize the termination were motivated by racial bias, McLaughlin's lack of knowledge of Greene's race cannot insulate Coach. *See Willis v. Marion County Auditor's Office,* 118 F.3d 542, 543 (7th Cir.1997) ("[T]here can be situations in which the forbidden motive of a subordinate employee can be imputed to the employer ... [T]his situation may occur in an instance in which a subordinate ... is able to manipulate the decisionmaking process and to influence the decision.").

For these reasons, Greene has raised material issues of fact as to whether her termination resulted from racial discrimination. Accordingly, defendant's motion for summary judgment is denied.

### C. After–Acquired Evidence Doctrine

 Coach relies on the after-acquired evidence doctrine in its motion to dismiss certain of plaintiff's damages claims. While the Supreme Court has held that after-acquired evidence of employee wrongdoing does not bar the employee's claims of employment discrimination, *McKennon v. Nashville Banner Pub'g Co.,* 513 U.S. 352, 360–61, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995), evidence that

the employee would have been terminated for lawful reasons will make certain remedies, such as reinstatement and front pay, unavailable. *Id.* at 362, 115 S.Ct. 879. In order to rely on the after-acquired evidence doctrine, an employer must establish that the wrongdoing was of such severity that the employee would have been terminated on such grounds alone if the employer had known of it at the time of discharge. *Id.* at 363, 115 S.Ct. 879.

As Coach points out, by plaintiff's own admission she misrepresented information on her employment application concerning her educational history and previous employment. Namely, Greene falsely claimed to have obtained a degree from the Fashion Institute of Technology[12] and omitted her prior termination from Ann Taylor, Inc. ("Ann Taylor") for removing merchandise from the store without paying for it. As evidence of the fact of Greene's prior termination from Ann Taylor and the reasons for it, Coach submits the affidavit of Ann Taylor Human Resources Associate Services Manager, Beth Sagar, as well as Ann Taylor's record of Greene's termination. *See* Sagar Aff. Coach argues that had it learned of Greene's misstatements, she would have been terminated. As support, Coach submits the affidavit of Kyle Rudy, Coach's Retail Director of Human Resources, stating that of the two cases with which he is personally familiar in which an employee falsified job history, Coach terminated the employees upon learning of the misrepresentation.

---

**11.** With respect to these sources, plaintiff points to evidence in the record that Young, who had supervisory authority over the Store's operations, held a racially stereotypical view of Greene and that Betonte–Middleton, the claimed source for her views, disavows ever having made these negative comments about Greene's performance. With respect to DeMasi, given evidence that his investigation was less than thorough and given that his recommendation to terminate

Greene followed his accusations that Greene was conspiring with a bank teller to steal money from the Store's register, a factfinder could come to the conclusion that his investigation was tainted with racial bias.

**12.** While Greene attended the Fashion Institute during the time period specified on her application, she did not obtain the degrees she claimed to have been awarded. *See* Valenza Aff. Ex. A, Greene Depo. at 131.

■ Greene's sole argument in opposition to plaintiff's proposed application of the after-acquired evidence doctrine is that summary judgment is not the appropriate stage for this determination. However, plaintiff's position that the after-acquired evidence doctrine cannot be applied at the summary judgment stage of a case misreads the relevant caselaw. It is true that where contradictory allegations by plaintiff and defendant raise a material issue of fact as to whether the after-acquired evidence would actually be a basis for termination, summary judgment is inappropriate. *Flores v. Buy Buy Baby, Inc.*, 118 F.Supp.2d 425, 432–33 (S.D.N.Y.2000) (denying defendant's motion to strike claims for front pay and reinstatement because "[t]here remain material issues of relevant fact as to whether BBB would have fired Flores solely on the basis of her falsified employment application"); *Blake–McIntosh v. Cadbury Beverages, Inc.*, No. 96 Civ. 2554(EBB), 1999 WL 643661 (D.Conn. Aug.10, 1999) ("Where an issue of material fact exists regarding whether the plaintiff's actions were so egregious that the employer would have discharged her solely on this basis, district courts have denied summary judgment on after-acquired evidence grounds, and have left the issue for the jury to decide at the remedy stage if the plaintiff succeeds on proving liability."); *Hillman v. Hamilton College*, No. 95 Civ. 1442(RSP)(GJD), 1998 WL 166827, *10–11 (N.D.N.Y. Apr. 9, 1998) (using similar language). However, there exists no per se rule that requires the issue of after-acquired evidence to be submitted to the jury where material facts are not in dispute. In fact, to create such a rule would be contrary to the directive of Rule 56. *See* Fed. R. Civ. Pro. 56(d) ("[T]he Court ... shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted ... including the extent to which the amount of damages or other relief is not in controversy.").

On the record presently before the Court, Coach (the moving party) has met its burden of establishing both that plaintiff falsified her employment records and that such wrongdoing, if discovered, would have resulted in immediate termination. Greene herself acknowledged at her deposition that she falsified her employment application,[13] and plaintiff has not put forth

---

**13.** At her deposition, Greene admitted that she misrepresented her educational history. With respect to the omission of her employment with Ann Taylor, the following colloquy occurred:

Q. Any other jobs that you have been let go from other than Handler and Coach? ...
A. Right. Yes.
Q. What other ones?
A. Ann Taylor.
Q. When was that?
A. I am not sure when. It was around the same time that I was working at Hair I Am, New York.
Q. So it was before you went to Coach?
A. Yes.
Q. Why were you let go from Ann Taylor?
A. Some disagreement, some misinformation.

. . . . .

Q. Who was your supervisor?

A. I don't remember who. We had a few.
Q. Who did you have the disagreement with?
A. We had Theresa Valenti was one.
Q. What was her title?
A. She was manager.

. . . . .

Q. What specifics can you tell me about the disagreement that you had or miscommunication?
A. None.

. . . . .

Q. Is there anything that you remember specifically?
A. I don't recall at this time.
Valenza Aff. Ex. A, Greene Depo. at 132–34.

any evidence to rebut Coach's substantial showing that Coach would have terminated her based on this misrepresentation. On this record, we find that there are no material facts in dispute with respect to the question of the impact of the after-acquired evidence. Therefore, defendant's motion to limit plaintiff's remedies is granted. Accordingly, plaintiff's claims for reinstatement and front-pay are dismissed and plaintiff's claim for back-pay is limited to the period between her termination and Coach's discovery of her misrepresentation.

### D. Punitive Damages

■ Punitive damages may be recovered under Title VII where the plaintiff establishes that the employer "engaged in a discriminatory practice ... with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). In *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 529–30, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), the Supreme Court articulated the standard for imposing liability for punitive damages on an employer for the malicious or recklessly indifferent discrimination of its agents. *See Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 384–85 (2d Cir.2001) (describing the holding of *Kolstad*). Employer liability may be imposed where an employee serving in a managerial capacity commits the wrong within the scope of his employment, unless the discriminatory actions were in contravention of the employer's good faith efforts to comply with Title VII. *Kolstad*, 527 U.S. at 545, 119 S.Ct. 2118; *Zimmermann*, 251 F.3d at 385. This good faith defense requires the employer to establish both that it had an antidiscrimination policy in place and that it made a good faith

effort to enforce it. *Zimmermann*, 251 F.3d at 385.

■ Defendant Coach moves to dismiss plaintiff's claims for punitive damages on the grounds that Coach's practices in establishing and enforcing antidiscrimination policies shield it from liability for punitive damages. In support of this position, Coach offers the affidavit of its Human Resources Director, attesting to its good faith efforts to comply with antidiscrimination laws, as well as copies of its Employee Guide, non-discrimination literature, and attendee lists at seven different employee harassment and discrimination training programs held from November of 1996 to December of 2000. However, despite this evidence, we find that material issues of fact exist as to whether Coach has made a showing sufficient to insulate it from punitive damages liability. The literature submitted by Coach describing its antidiscrimination policy reveals little about the manner and extent to which Coach retail managers were exposed to these principles. Further, as plaintiff points out, none of the harassment and antidiscrimination training programs for which Coach submitted attendee lists occurred during the two-year period during which Greene worked at the company. As Greene points out, a dearth of antidiscrimination training during the time period at issue in this lawsuit could actually lead a jury to infer that Coach did not, in fact, make a good faith effort to enforce such policies. Because at this stage of the litigation, Coach has not definitively established that it had an antidiscrimination policy in place and that it made a good faith effort to enforce it, the motion to dismiss Greene's claims for punitive damages is denied.[14]

---

**14.** The question of whether punitive damages may be imposed under *Kolstad* may, of course, be revisited at trial based on the evidence.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is denied and defendant's motion to dismiss plaintiff's punitive damages claims is also denied. Defendant's motion to dismiss plaintiff's claims for reinstatement, front-pay, and limited back-pay is granted.

**IT IS SO ORDERED.**